Nichols, Judge,
delivered the opinion of the court:*
The plaintiffs, John B. Hardwick© Company and Charles E. Pratt, are seeking just compensation under the Fifth Amendment for an alleged taking of a flowage easement by the defendant over approximately '573 acres of a 829.52 acre *390 tract located in the lower Kio Grande Valley of Texas. The alleged taking took place on August 30,1967. On that date the International Boundary and Water Commission, prompted by the threatened flooding of the Brownsville-Matamoros area, in course of a flood on the Kio Grande, closed the gates of the Anzalduas Dam and diverted the waters of the Kio Grande into Mission Inlet, inundating plaintiffs’ property.
The plaintiffs’ property is located in the natural flood plain of the Kio Grande Kiver. In the natural state of affairs this land was subject to flooding on an average of once every two years. The first attempts at flood control in the area took place in the 1920’s when Cameron and Hidalgo Counties initiated a system of flood control works. By 1930, however, it had become evident that the problem of flooding could only be dealt with adequately by gaining the cooperation of Mexico. In 1932 an accord was reached between the United States and Mexico which provided for flood control works along the lower Kio Grande Valley. In that same year the International Boundary Commission prepared a report entitled “Preliminary Report on Flood Control Plans— Lower Rio Grande”. The plan contemplated among other things the construction of two diversion dams. The first was to be located immediately below Mission Inlet and the second at a point opposite Donna, Texas, and Colombres, Tamauli-pas (downstream from Hardwieke property). This plan called for diversion of the Rio Grande into Mission Inlet and thence to the floodway at times of flooding. (IBWC Minute 196, pg. 1-3 of Engineers Report.) See authorizing legislation 22 U.S.C. § 277 a and ff.
Though portions of the 1932 plan could be acted upon forthwith, other parts, including the construction of the diversion dams, were delayed until an agreement as to the division of the run-off water could be reached between the United States and Mexico. The Treaty of February 3, 1944, constituted that agreement. The treaty established the International Boundary and Water Commission (IBWC), and provided: 1.) for the construction of “The dams and other joint works required for the diversion of the flow of the *391 Rio Grande * * *”, and the construction of three international storage dams, the furthest downstream being the Falcon Dam (above plaintiffs’ property) Article 5, Sec. II of the Treaty, 59 Stat. (Part 2) 1219; and, 2.) “The Commission shall study, investigate, and prepare plans for flood control works, where and when necessary, other than those referred to in Article 5 of this Treaty, on the Rio Grande (Rio Bravo) from Fort Quitman, Texas to the Gulf of Mexico.” Article 6.
Because of the operation of other segments of the Rio Grande water control program, in 1950 the IBWC modified its 1932 proposal for the construction of two diversion dams. Instead the Commission proposed the “construction of [one] diversion dam to divert water into that [United States] floodway, as was contemplated in the original [1932] plan.” Minute 196IBWC pp. 3-4. This dam was to he the Anzalduas Dam. Congress first appropriated funds for the construction of Anzalduas Dam in 1952 as part of the “expenses necessary to enable the United States to meet its obligations under the treaties of 1884, 1889, 1905, 1906, 1933, and 1944 between the United States and Mexico, and to comply with the other laws applicable to the United States Section, International Boundary and Water Commission * * 67 Stat. 369-70. It is significant that of the Treaties and laws mentioned in the construction section of the appropriation only the 1944 Treaty, which specified as one of its projects the construction of Falcon Dam, authorized the construction of diversion dams on the lower Rio Grande. As written, the construction section of the 1952 appropriation points to the fact that Congress understood the Anzalduas Dam to be expressly provided for in the 1944 Treaty.
As called for in the 1944 Treaty, Falcon Dam was placed in operation in 1952. The operation of this dam reduced the anticipated incidence of flooding on the land at issue from once every two years to once every ten years. This reduction for the first time made the land in question suitable for farming.
In 1959 Anzalduas Dam was completed and it was placed in operation in 1960. It is estimated that the operation of *392 this dam increased the incidence of flooding on the land in question to once every seven or eight years. Thus, though the incidence and severity of flooding was increased from what it would have been if only Falcon Barn was in operation the expectation of flooding was still far less than it would have been if there had been no flood control program at all.
In 1961, John B. Hardwicke, Jr., William A. Hardwicke and Charles E. Pratt began acquiring portions of the property in question and 'by 1963 all 892.52 acres of what is now the Hardwicke property was acquired and developed into farm land. Of the 892.52 acres of land constituting the Hardwicke property 320.76 acres were encumbered with various easements obtained by the defendants so as to insure the continued use of Mission Inlet for flood control purposes.
As noted above, on August 30,1967, the IBWC, prompted by the threat of flooding in the Brownsville-Matamoros area, and the damages to life and property inherent in the flooding of a highly populated area, closed the gates of Anzalduas Dam. This action caused the backing up of river waters, their diversion into Mission Inlet, and the flooding of plaintiffs’ property. The question raised is whether the defendant should have to pay compensation because of an alleged taking which took place as a result of the construction and operation of Anzalduas Dam.
In 1943, Justice Roberts writing for the majority of the Supreme Court in the case of United States v. Miller, 317 U.S. 369, established what has come to be known as the Miller Doctrine. According to this doctrine a condemnor need not compensate a landowner for value which the con-demnor creates by the establishment of the project for which the landowners land is condemned. Miller affirmed the ruling of the trial judge excluding from an award for property taken, enhancement of its value resulting from the project itself. The same principle is for application when, in a flooding case, the question is whether property is taken at all.
In United States v. Sponenbarger, 308 U.S. 256 (1939), the respondent was the pwner of land designated as a flood- *393 way as part of a flood control program for the Mississippi River. Although respondent’s land was on the whole benefited by the flood control program, respondent claimed a Fifth Amendment taking on the ground that the program contemplated the construction of higher levees surrounding the floodway so as to have floodwaters run off onto respondent’s property. In his opinion denying relief to respondent, Mr. Justice Black stated, pps. 266-67:
* * * if governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty. * * *
In United States v. Reynolds, 397 U.S. 14, 18 (1970) the Court reaffirmed Miller and held that for it to apply, the correct test was whether the property was “probably within the scope of the project from the time the Government was committed to it, * *
Before 1950 a buyer of land in the neighborhood of Mission Inlet knew or should have known that the flood control plan agreed upon with Mexico contemplated the construction of both storage and diversion dams. Since 1932 Mission Inlet had been viewed as a strategic means of diverting flood water from the riverbed into the United States floodway. He could not have counted on the floodway remaining unused. The 1950 decision of the IBWC was more than the ordinary recommendation of Government officials because of the Treaty obligation it implemented. The substitution of the Anzalduas Dam at that date did not alter the potential burden on plaintiffs’ property since defendant continued to rely on Mission Inlet for diversion, as the 1932 plan had done. The Congressional appropriation of 1952, supra, recognizes that Anzalduas will be built in fulfillment of an international obligation under a Treaty.
1952 also saw the completion of Falcon Dam and thus there never was a time when an owner of land near Mission Inlet could have directly benefited from Falcon, yet have been unaware that Anzalduas would arise in fulfillment of *394 the same scheme. There was no time when plaintiffs or their predecessors in title could have reasonably supposed that land near Mission Inlet could benefit from the impoundment of water at Falcon, yet be free of the disadvantages that might arise from the diversion dam, when built and in use. The trial commissioner did not accept the contentions of the plaintiffs as to their actual beliefs, but in any event the legal standard is not subjective belief, but probability.
The plaintiffs say they paid in 1961-68 prices enhanced by the presence of Falcon Dam and its anticipated success in controlling floods. On those dates Anzalduas Dam was completed and in plain sight, with its gates. Vendors to plaintiffs may have benefited from Falcon without taking a detriment because of Anzalduas, but in the circumstances, we do not think the defendant can be penalized because of this business decision between private parties. We think the circumstances show sufficient nexus between Falcon and Anzalduas, sufficient probability that Anzalduas would come into being after Falcon, so that plaintiffs cannot base a taking claim on the hypothesis that they can garner the benefit conferred by Falcon, without deduction for the probable detriment when Anzalduas comes into being too.
Prior to the construction and operation of Falcon Dam the Hardwicke property was not suited to farming because of often recurring floods. The approximate value of the property prior to the operation of Falcon Dam was $110,000. After Falcon Dam was placed in operation, and the danger of flooding greatly reduced, the property became suitable for farming and rose in value to $392,500, if valued without Anzalduas. After the construction of Anzalduas the likelihood of flooding of the Hardwicke property increased somewhat and the value of the Hardwicke property with Anzalduas Dam in operation was $352,250. It is clear that, while the operation of Anzalduas Dam has diminished the value of plaintiffs’ property, on the whole, the value of the Hardwicke property has been greatly enhanced by the operation of the Bio Grande water control program, of which both Falcon and Anzalduas Dams are parts.
*395 In view of the Sponenbarger decision, and because this case falls under the purview of the Miller Doctrine, petitioners’ claim for relief is denied and the conclusion of the commissioner is affirmed. The petition is dismissed.
Findings oj? Fact
1. On August 30, 1907, the date of alleged taking in this case, J. B. Hardwicke, J. B. Hardwicke, Jr., William A. Hardwicke, and Charles E. Pratt owned in fee simple, subject to various easements and encumbrances, 892.52 acres of land located in Porciones 53 and 54, Hidalgo County, Texas. This acreage (hereinafter referred to as the Hardwicke property) is the total amount of land conveyed by the following deeds and described therein: (a) Crom to Pratt and the above Hardwickes, August 1, 1961, approximately 717.87 acres, 1014 Hidalgo County Deed Eecords (hereinafter cited HCDE) 446; (b) Lockhart to Hardwicke, June 14, 1963, approximately 58.65 acres, 1065 HCDE 227; (c) Baker to Pratt and the Hardwickes, June 27, 1963, approximately 97 acres, 1065 HCDE 537; and (d) Dietz to Pratt, December 30, 1963, approximately 19 acres, 1078 HCDE 590. The Hard-wicke property can be described, generally, as being bordered on the north by the Military Highway, on the south by the Eio Grande, and on the east and west by Porciones 55 and 52, respectively.
2. Of the 892.52 acres comprising the Hardwicke property, 814.87 acres are owned and were so owned on August 30, 1967, as follows: an undivided one-half interest in Charles E. Pratt, an undivided one-fourth interest in J. B. Hardwicke, an undivided one-eighth interest in J. B. Hardwicke, Jr., and, an midivided one-eighth interest in William A. Hard-wicke. Of the remaining 77.65 acres, 58.65 acres are owned jointly by J. B. Hardwicke, J. B. Hardwicke, Jr., and William A. Hardwicke, and 19 acres are owned by Charles E. Pratt.
3. On August 30, 1967, the Hardwicke property was subject to five easements which had been conveyed to the United States by Cameron County, Texas, pursuant to 22 U.S.C. *396 §§ 277-77d (1970). These easements were conveyed during the years 1955 through 1957, were designated 831-H, 813-H, 805-H, 806-H and 812-H, and are as follows: 831-H burdens 32.31 acres of the Hardwicke property and is an easement for floodway, levee and channel; 813-H burdens 9.42 acres of the Hardwicke property and is an easement for levee and spoils; 805-H burdens 8.36 acres of the Hardwicke property and is an easement for levee and spoils; 806-H burdens a total of 38.22 acres, 12.20 acres of which is on the Hardwicke property, and is a channel easement; 812-H burdens 258.47 acres of the Hardwicke property and is an easement for channel and spoils. The total amount of land burdened by these easements is 346.78 acres, 320.76 acres of which is located on the Hardwicke property. Consequently, as of August 30, 1967, of the 892.52 acres comprising the Hardwicke property, 571.76 acres were not burdened by easements given to the United States.
4. The Hardwicke property is located upriver from Anzalduas Ham in the natural floodplain of the Eio Grande and is riverward of a series of levees which were designed to protect the uplands from floods. The levees turn inland above the property to create an opening into the Main Floodway. This opening is Mission Inlet and is located at river mile 177.8, i.e., 177.8 miles upriver from the mouth of the Eio Grande. Before the levees were constructed one of the first major outflows, in the case of a flood in the channel above Brownsville-Matamoros would occur at Mission Inlet. After the water would leave the river at this point, it would flow to the east until it reached Mercedes and from there a large amount would flow down the Arroyo Colorado. It was for this reason, the natural tendency of floodwaters to leave the river at Mission Inlet, that this inlet was selected as a point at which excess flows should leave the river and enter the floodway.
5. There is very little drainage into the Eio Grande at Mission Inlet since the land in this area tends to decrease in elevation as the distance from the river increases. Consequently, most of the drainage is away from the river to the north, and in the direction of the Gulf of Mexico to the east. *397 The drainage area above Anzalduas Dam and below Marte Gomez and Falcon Reservoirs is approximately 4,055 square miles.
6. The Hardwicke property is relatively level and ranges in elevation from approximately 116.7 feet m.s.l. to approximately 103 feet m.s.l. Effectively, the lowest point along the river bank is located on the eastern side of the property and has an elevation of 107.5 feet m.s.l. There is a point on the same bank which has an elevation of oxdy 103.4 feet m.s.l.; however, this point is located at the foot of a steep acclivity which rises to an elevation of 111.6 feet m.s.l. The point at which the river in flood first enters the Hardwicke property to flow into Mission Inlet is located on the western bank of the property immediately adjacent to the point at which the Rio Grande begins to flow south. This point has an elevation of approximately 109 to 110 feet m.s.1. The point on Military Road at which the floodwaters actually flow into the Main Floodway has an elevation of approximately 112.5 feet m.s.l. Consequently, it has been estimated that diversion of flood-waters into the Main Floodway via Mission Inlet cannot occur until the water surface at the mouth of the inlet is at an elevation of 112.5 to 112.8 feet m.s.l. When the floodwaters at the mouth of Mission Inlet have reached such elevation, most of the Hardwicke property will be inundated.
7. The John B. Hardwicke Company has been farming in the lower Rio Grande Valley since 1948. This company is a partnership and on August 30,1967, consisted of the following partners: John B. Hardwicke, John B. Hardwicke, Jr., and William Hardwicke.
8. On August 30,1967, the Hardwicke property was rented to the John B. Hardwicke Company, a partnership. Charles E. Pratt received one-half the standard rent and the individuals comprising the partnership received the other half. The standard rent consists of an amount equal to one-fifth and one-fourth of the value less harvesting and selling expenses of all the vegetables and all the cotton and grain, respectively.
9. On August 30, 1967, there were 142 acres of cotton which had been picked once and 98 acres of peppers growing *398 on the Hardwicke property. Peppers are planted from the first week in July through the third week in August and are harvested around the 10th of December, weather permitting. Cotton is planted in February and March and is harvested during August and, occasionally, the first week of September. Usually, the cotton is picked twice.
10. Following a severe flood in 1922, Cameron and Hidalgo Counties embarked upon a flood control program which was based upon a plan proposed by the United States Bureau of Reclamation and approved by the Texas reclamation engineer. Pursuant to this plan, levees were constructed along both sides of the floodway, the entrance to the floodway being located at Mission Inlet. It became evident, however, by 1930, that the problem of flood control in this area could be solved completely only with the cooperation of Mexico. An accord was reached between the United States and Mexico in 1932 and a preliminary report was prepared by the International Boundary Commission and dated September 3 of that same year. This report contemplated the construction of interior floodways in both countries, levees along both sides of the Rio Grande, and two diversion dams. The purpose of the diversion dams would be to insure that the flow in the Brownsville-Matamoros Channel did not exceed 30,000 c.f .s. The plan hypothesized a flood of approximately 187,000 c.f.s. in the Rio Grande at Peñitas, of which 107,000 c.f.s. would be diverted by a dam tentatively recommended for construction immediately below Mission Inlet. Of the remaining 80,000 c.f.s., 45,000 c.f.s. would be diverted at the second proposed diversion dam which, it was recommended, would be placed in the vicinity of Donna, Texas, and Colombres, Tamaulipas, Mexico, and 5,000 c.f.s. would be diverted into the Rancho Viejo Floodway, which is just above Brownsville. The remaining 30,000 c.f.s. would flow down the river into the Gulf of Mexico. If the flood at Peñitas were 80,000 c.f.s. or less, it was hypothesized that the amount in excess of 35,000 c.f.s. would be diverted at the proposed dam at Donna and Colom-bres and the remaining flow controlled in the same manner as the 35,000 c.f.s. balance of the larger flow. One of the two diversion dams contemplated by the preliminary report was *399 to be placed in the same vicinity as the present Anzalduas Dam and the other was to be placed near what is presently the Retamal Canal intake.
11. The International Boundary Commission began to build and improve the levees and floodways in 1935 and by this time the counties had already done a considerable amount of work on the floodway in the Mission Branch. However, construction of the proposed diversion dams was postponed until the two countries could reach an agreement regarding the division of the waters. On February 3,1944, an agreement was reached in the form of a treaty between the United States and Mexico. This treaty provided for the construction of storage and diversion dams. The International Boundary Commission was redesignated the International Boundary and Water Commission, and it was provided that the flows in excess of the safe channel capacity at Brownsville-Matamoros would be divided equally between the two countries. This was the agreement which was in effect on August 30,1967.
12. By 1950 the levees along the river and the interior floodways which had been originally contemplated in 1932 were largely completed. In December 1950 the International Boundary and Water Commission modified the plan which the International Boundary Commission had drafted in 1932. The 1932 plan had provided for the construction of two diversion dams and the modification provided that there would be only one diversion dam to be located at the Anzalduas site. The reasons for the modification were the expected changes in the nature of the flood flows which would reach the head of the lower Rio Grande flood control project, due largely to the operation of Marte Gomez Dam and Reservoir and the proposed Falcon Dam and Reservoir, and changes which had occurred in the hydraulic characteristics of the Rio Grande. It was expected that Falcon and Marte Gomez would decrease the frequency of floods but increase the duration of low-flow floods, especially those of less than 60,000 c.f.s.
13. The flood control plan as modified in December 1950 was also based upon a design flood of 187,000 c.f.s. although *400 it was expected that a flood of such, proportions would rarely occur after Falcon Dam and Reservoir were placed into operation. Under tlie modified plan, 90,000 c.f.s. and 2.2,000 c.f.s. would be diverted into the Mission and Hackney Inlets, respectively, and about 45,000 c.f.s. would be diverted into Mexico’s floodways above Brownsville-Matamoros. Hackney Inlet is below Anzalduas Dam and joins Mission Inlet in the Main Floodway at a point which is south of the road which passes between the towns of McAllen and Pharr, Texas.
14. Falcon Dam was the first international storage dam to be built under the treaty of 1944. The dam is located at river mile 278.8 near Zapata, Texas, and was first placed into operation in 1952, although it was not completed at that time. The purpose of this dam is to store water for both irrigation and flood control purposes. For the latter purpose this dam can retain up to 1,710,000 acre-feet of water. At the time the Crom tract was conveyed to Charles E. Pratt, William Hard-wicke, J. B. Hardwicke, and J. B. Plardwicke, Jr., Falcon Dam had been completed but the Amistad Dam had not. Until Falcon had been placed into operation it had not been economically feasible to irrigate the land now comprising the Hardwicke property due to the frequency of floods and, consequently, the land had been unsuitable for farming.
15. During 1953,1954, and 1959, the International Boundary and Water Commission requested Cameron and Hidalgo Counties to furnish easements for either flowage, or levee and spoils, or inundation, over all of the land which now comprises the Hardwicke property. However, only the easements which are referred to in finding 3 were furnished to the United States, and with respect to the balance of the land, an indemnity agreement was entered into between the United States and Cameron County. The decision on the part of the United States to accept an indemnity agreement instead of easements was not prompted by engineering considerations.
16. The International Boundary and Water Commission originally intended to construct a diversion channel into the Main Floodway at Mission Inlet and to reinforce this channel with levees. After Cameron County had supplied certain easements across what is now the Hardwicke property but, *401 before the channel was excavated or the supporting levees constructed, this plan, was abandoned.
17. Anzalduas Dam, located at river mile 171.6, was placed into operation in 1960 and is operated and maintained as a joint project between the United States and Mexico. The purposes of the dam are to divert water into the United States and Mexico for irrigation and flood control. The dam was intended to protect Brownsville and Matamoros from floods under 60,000 c.f.s. which would be generated in the Bio Grande between Falcon and Marte Gomez Dams and An-zalduas. During a large flood, as during the peak of the September 1967 flood, the gates of Anzalduas Dam remain open. The flood control plan which was in effect on August 30, 1967, necessarily involved diverting the portion of low-flow flood waters allocable to the United States into Mission Inlet by closing the gates of Anzalduas Dam and raising the stages upstream. The dam has six 75' x 21' roller gates which are supported on concrete foundations in piers and abutments.
18. Anzalduas Dam had been completed by the time Charles E. Pratt, William Hardwicke, J. B. Hardwicke, and J. B. Hardwicke, Jr., acquired the various tracts which presently comprise the Hardwicke property.
19. Amistad was the second international storage dam to be completed pursuant to the treaty of February 3, 1944. This dam was placed into operation in 1967 and is located at river mile 567.6 near Del Bio, Texas. Amistad Dam is multipurpose and can retain 1,775,000 acre-feet of water for flood control purposes.
20. In 1950, when Minute No. 196 was drafted by the International Boundary and Water Commission, the safe channel capacity at Brownsville-Matamoros was approximately 30,000 c.f.s. At the time of the 1958 flood, the safe channel capacity was 10,000 c.f.s. On August 30,1967, it was between 12,000 and 13,500 c.f.s. Presently, the safe channel capacity is between 15,000 and 20,000 c.f.s.
21. The drought conditions in the early 1950’s caused considerable deterioration in the channel of the Bio Grande downstream from Anzalduas Dam. The diminution in the safe channel capacity at Brownsville-Matamoros is largely *402 the result of the growth of vegetation along the slopes and in the channel of the Rio Grande. This growth takes place most readily in times of drought and is most pronounced in the stretch of the river between the Hidalgo-Cameron County line and 20 miles below Brownsville. There is presently in operation a program, which was started in 1959 to clear away this vegetation, and these operations have cleared as far upstream as the town of Hidalgo. The possibility, however, of the channel’s being restored to its 1950 capacity is so remote as to be beyond speculation.
22. The normal flow of the river tends to retard vegetation growth in the channel where the water is. When there is a flood, such as in 1958 and in September 1967, it has some scouring effect. However, the vegetation which has diminished the capacity of the channel does create a backwater effect. The deterioration of the channel in the Brownsville-Matamoros area has a backwater effect which extends further upstream than the Hardwicke property and is reflected in the cross section of the river.
23. Between March of 1956 and April of 1971 the cross section of the Rio Grande which is one-half mile above Anzalduas Dam increased in size. However, between August of 1960 and May of 1967 there was a diminution in the cross-sectional area of the channel at this point.
24. The cross-sectional area of the channel which is 2 miles above Anzalduas Dam diminished in size between March 1956 and May 1967. Between May 1967 and April 1971 the cross-sectional area has remained approximately the same although during this period there was a slight amount of silt deposited on the bottom but not to the same extent as during the immediately preceding 11-year period.
25. The cross-sectional area of the channel which is 5 miles above Anzalduas Dam diminished in size between August 1960 and May 1967. However, this area increased between May 1967 and April 1971. Consequently, between August 1960 and April 1971 there was little net change in the cross-sectional area of the river at this point although there was some change in its configuration.
*403 26. The cross-sectional area of the river 2 miles above the Hardwicke property greatly increased in size between March 1956 and April 1971. Although there was also an increase in the cross-sectional area between August 1960 and April 1971 due to the washing which took place on the United States bank of the river, there was also some silt deposited in the bottom of the channel during this same period.
27. There has not been a substantial change in the overall configuration of the Bio Grande in the Brownsville-Mata-moros area between 1950 and 1971. However, there have been such changes in certain areas. During this same period there has been a marked change in the amount of vegetation which grows along the river and into the channel.
28. Anzalduas Dam with the gates open causes no appreciable backwater effect, notwithstanding the presence of a gate sill which rises 2.91 feet from the bed of the river; moreover, the presence of Anzalduas Dam has not been the cause of any substantial silt deposits upstream.
29. Before the Anzalduas Dam was built there would have been no flooding of the Hardwicke property with a flow of 30,000 c.f.s. passing what is now the site of Anzalduas. With a flow of approximately 33,000 c.f.s. there would have been some slight flooding of the Hardwicke property. However, this would be confined to the low, brush-filled areas.
30. Under present conditions and with the gates of Anzalduas Dam open, the elevation of the surface of the water at Mission Inlet will be 109.6 feet if there is a flow of 30,000 c.f.s. below Mission Inlet. For a flow of 40,000 c.f.s. the elevation will be 111.9 feet, and for 50,000 c.f.s. the elevation will be 113.4 feet. Presently, with a flow below Mission Inlet in excess of 28,500 c.f.s. and the gates of Anzalduas open, there will be slight flooding of the Hardwicke property. This greater susceptibility to floods is the fault of clogging of the channel by vegetation and not because of the dam.
31. Under present conditions the Hardwicke property will be flooded to approximately the same extent with the Anzalduas gates closed on a flow of 22,000 c.f.s. as it will be with a flow of between 35,000 c.f.s. and 40,000 c.f.s. and the *404 gates open. On August 80, 1967, the gates had been closed on a flow of 22,200 c.f.s.
32. If there had been no flood control structures in the watershed above Mission Inlet during the latter part of August 1967, the flow at Mission Inlet on August 30, 1967, would have been 65,000 c.f.s. Based upon the channel conditions that existed at that time, this flow would have inundated substantially all of the Hardwicke property.
33. If neither Falcon Dam nor Amistad Dam were present, Mission Inlet would be used for flood diversion approximately once every 2 years, as it was during the 23-year period immediately preceding Falcon’s being placed into operation. Since 1954 Mission Inlet has been used for flood diversion purposes on three occasions, once during 1958 and twice during 1967.
34. Due to the various factors which determine what the flow will be in that area of the Bio Grande which lies between Falcon and Marte Gomez Dams and Anzalduas Dam, it is impossible to predict accurately when and how often the gates of Anzalduas Dam will be closed. It is only by closing the gates that the Anzalduas Dam causes the Hardwicke property to be flooded.
35. With the flood control system as it existed on the lower Bio Grande on August 30, 1967, it is estimated that waters will be diverted into Mission Inlet approximately once every 7 or 8 years. Even without the operation of Anzalduas Dam there would be some flooding of the Hardwicke property at approximately the same frequency. However, the operation of Anzalduas substantially alters the extent of flooding from inundation of only the low-lying brushland to inundation of most of the cropland. Consequently, with the operation of Anzalduas Dam the average acre of cropland on the Hard-wicke property will probably be flooded once every 8 years, whereas without the operation of the dam the average acre of cropland would probably have been flooded about once every 10 years. Defendant’s expert gave it as his opinion at the trial that there is a 20-percent increase in the frequency at which the average acre of Hardwicke cropland will foe flooded as a result of the operation of Anzalduas Dam.
*405 36. On August 29, 1967, the principal engineer for the flood control project relayed the instruction to close the gates on the Anzalduas Dam. The instruction was given pursuant to a decision by the International Boundary and Water Commission that unless the gates were closed the Brownsville-Matamoros area was in danger of being flooded. At 10:30 p.m. on August 29 gradual closure of the gates at Anzalduas was begun, and by 2 a.m. on August 30 the gates were completely closed. The gates were closed on a flow of 22,200 c.f.s. and remained completely closed until 1 p.m. on September 3,1967.
37. The closing of the gates of Anzalduas caused the water surface opposite Mission Inlet to rise to an elevation of approximately 112.8 feet. There was a point on the northeast bank of the Hardwicke property with an elevation of 107.5 feet m.s.l. and this fact was known to the International Boundary and Water Commission because of a survey which had been taken.
38. The agreement between Mexico and the United States which was in effect in August 1967 provided that each country would divert half of the flows in excess of the safe channel capacity at Brownsville-Matamoros. During the August 1967 flood the following peak diversions were made by Mexico : 6,820 c.f .s. into Anzalduas Canal; 2,500 c.f .s. into Retamal Canal; 1,230 c.f.s. into San Rafael Floodway. The only diversion on the United States side was made through Mission Inlet and this was a peak diversion of 430 c.f.s. The flow into Mission Inlet began at 5 p.m. on August 30,1967, and ended at midnight on September 3, the peak occurring on August 31.
39. There are no mechanical devices on Mission Inlet or the Main Floodway to control the inflows. The hydraulic control for the beginning of flow into Mission Inlet was, in August 1967, and is now, the level of the natural banks of the river and the adjoining lands which comprise the inlet to the Main Floodway.
40. Some flooding of the Hardwicke property took place before there was any diversion into Mission Inlet. By 9 a.m. on August 30 approximately 55 acres of noneasement land on the east side of the property were inundated and by noon *406 tbe same day water was entering the west side of the farm. Ultimately, substantially all of the Hardwicke property was inundated as a result of the closing of the gates on Anzalduas Dam.
41. During the flood which took place on August 30,1967, the Hardwicke property was the only property which was inundated as a result of the closing of the igates of Anzalduas Dam. If the gates on Anzalduas Dam had not been closed on August 30,1967, there would have been no inundation of the Hardwicke property between August 29 and September 3, 1967. This is the only occasion on which the closing of the gates on Anzalduas Dam has resulted in inundation of the Hardwicke property. As a result of the closing of Anzalduas Dam on August 30, 1967, the water level of the river was raised 4.9 feet above what it otherwise would have been.
42. As a result of the August 1967 flood, all of the crops which were then growing on the Hardwicke property were destroyed and substantial damage was done to the land. In addition, many of the low areas of the property were filled with water which remained for several months, sand bars were deposited on previously level land, and large quantities of fertilizer were removed from the soil.
43. A modification was proposed after the flood of 1967 which would alter the manner in which low-flow floods are diverted before reaching the Brownsville-Matamoros Channel. Under the modified plan Mission Inlet would be closed and there would be a new inlet on the United States side of the river at the site of the Anzalduas Dam. Although there has been an appropriation made for the effectuation of this plan, many aspects of the plan have not yet been precisely formulated, such as the manner in which Mission Inlet will be closed. Although it appears that the effect of the plan on the frequency and extent to which the Hardwicke property will be flooded will be negligible, any statement concerning the water profile at Mission Inlet as a result of the proposed modifications would be speculative.
44. At the time Charles E. Pratt, William Hardwicke, J. B. Hardwicke, and J. B. Hardwicke, Jr., were conveyed the Crom tract, they were aware that the tract lay entirely *407 riverward of the levee. Moreover, the Hardwickes were well aware of what the effects of a large flood, such as the 1958 flood, would be on this and other tracts similarly located and this certainly had a bearing on the purchase price of the tract. However, it was not expected that a low-flow such as occurred on August 29-30,1967, would result in substantial inundation. The Hardwickes and Pratt were aware of the easements which had been conveyed to the United States, and were also aware that some of the land over which there were easements had a greater elevation than some of the noneasement land. However, they were unaware of the indemnity agreement between Cameron County and the United States. By the time the first purchase of Hardwicke property was made from Crom on August 1,1961, Anzalduas Dam had been completed.
45. In September 1967 Hurricane Beulah caused floods in the lower Rio Grande Yalley which had a peak of 220,000 c.f.s. at Fort Ringold, on September 22 and 23. The peak of the flood which had occurred the month before was 29,600 c.f.s. at Fort Ringold. During the peak flow of the September flood the gates at Anzalduas were open. There was a flow into Mission Inlet from 11 p.m. on September 21 until noon on October 3. All of the Hardwicke property was inundated during the September flood.
46. Land sales in the floodway cannot realistically be considered comparable sales for the purpose of determining the value of the Hardwicke property, due largely to the difference in size between floodway tracts and the Hardwicke property and the difference in type of easements found on the two types of property. The four sales of what now constitutes the Hardwicke property constitute a sufficient market to establish fair market value with all dams in operation except Anzalduas.
47. The average price per acre which the Hardwickes and Pratt paid for the Hardwicke property in the years 1961 and 1963 was approximately $300. The cost of improving the property was approximately $100 per acre. The total cost approximated $357,000. In the period 1961-67 the price of land, except for citrus farmland, has remained fairly stable in the area of the Hardwicke property.
*408 48. After the various tracts which, comprise the Hardwicke property were purchased, the following improvements were made: the Crom tract was leveled, a pipeline project was entered into, and additional wells were drilled. A soil conservation plan was prepared by the Soil Conservation Service in August 1963. This plan was conscientiously followed by the plaintiffs and in 1966 the Hardwicke property was given the “Farm-of-the-Year Award.”
49. Before the construction of the Falcon Dam, the highest and best use of the Hardwicke property was pasture. There were three sales of property which would tend to reflect the value of the Hardwicke property as pastureland. These sales were made in 1964 and 1965 and were of tracts which are smaller than the Hardwicke property but which are located on the river side of the levees and which are, therefore, subject to flooding but not to the extent that the Hardwicke property would be without the presence of Anzalduas Dam. These tracts are subject to fewer easements than was the Hardwicke property prior to the August 30,1967, flood. The three tracts sold for approximately $200 per acre. Based upon these sales the Hardwicke property was worth approximately $170,000 before the Falcon Dam was placed into operation.
50. The value of the Hardwicke property with all of the upstream dams in place but without the Anzalduas Dam is approximately $392,500, or $440 per acre. This value is based upon market data from seven sales, four of which were the sales of the various portions of the Hardwicke property to the plaintiffs and three of which were sales of similar property during 1966, 1968, and 1970. Insofar as the sales of property to plaintiffs are concerned, the fact that it cost them approximately $100 per acre to improve the property after it was purchased is also taken into account. The plaintiffs paid approximately $300 per acre for the Hardwicke property. The sale of a 428-acre tract during May 1966 was for $315 per acre. The Hardwicke property has a better water supply, a higher percentage of cropland, and more easement acreage than does this tract. The sale of a 150-acre tract during June 1968 was for $300 per acre. After the buyer bought this tract he spent approximately $100 per acre restoring this *409 land to its pre-September 1967 condition. This tract is generally better farmland than is the Hardwicke propetry. However, the Hardwicke property is better irrigated. The sale of a 692-acre tract during May 1970 was for approximately $398 per acre. The house which was located on this piece of property when it was sold was worth between $25,000 and $50,000. The Hardwicke property is better leveled than this tract but has a higher ratio of easement to noneasement land.
51. Since the Anzalduas Dam has been in operation, the river in the vicinity of the Hardwicke property has not been so severely affected by droughts as it was before the dam was constructed, such as during the early 1950’s, for example. Consequently, there is a pool of water adjacent to the plaintiffs’ property which is superior for irrigation purposes to an unregulated stream. In addition, this pool provides a source of recreation.
52. Although there is one sale which might be compared with the Hardwicke property to determine its value after Anzalduas Dam was placed into operation, an evaluation of the diminution in value of each area of the property is a more valid approach to the problem insofar as one sale does not provide a market. Consequently, the after-Anzalduas value of the Hardwicke property is determined as follows: there are approximately 500 acres of cropland in the area over which the defendant had not acquired easements prior to August 30, 1967. As a result of the operation of Anzalduas Dam this land is worth $100 per acre less now than it was before August 30, 1967. There were approximately 65 acres of woodland which was enhanced for recreation by approximately $150 per acre. The value of the balance of the property is not affected by the presence and operation of Anzal-duas Dam. Consequently, the value of the Hardwicke property after the Anzalduas Dam was put into operation is approximately $40,250 less than before the dam was put into operation, or $352,250.
53. The value of the peppers and cotton which were growing on the Hardwicke property on August 30,1967, was $300 and $60 per acre, respectively. There were 98 acres of peppers and 142 acres of cotton. The cost of growing peppers and *410 cotton, not including the cost of harvesting, is $175 and $150 per acre, respectively. Plaintiffs claim $41,500 for loss of crops due to the August 30, 1967, flood and $33,000 as the cost of restoring the land to its pre-flood condition. These costs are reasonable and supported by the evidence.
54. Plaintiffs’ total claim, as modified by the evidence, is for $253,000, the difference in the alleged before-flood value ($363,250) and after-flood value ($110,250) of the Hard-wicke property, including crop losses and restoration costs, and representing the alleged damage to the subject property by reason of the alleged taking of a flowage easement over the land on August 30, 1967. Plaintiff has rounded off its claim to $250,000, which sum is found unsupported by the weight of the credible evidence.
CONCLUSION of Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover and the petition is dismissed.

 We acknowledge the assistance afforded ns by the able opinion and findings of fact of former Commissioner, now Judge, Marlon T. Bennett. We have prepared our own opinion because we reach the same result by a different route.