**Lloyd K. JOHNSON and Marion Johnson**
v.
**The UNITED STATES.**
No. 439–69.

United States Court of Claims.
June 20, 1973.

David P. Sullivan, Duluth, Minn., attorney of record, for plaintiffs. Robert W. Boyd, Duluth, Minn., of counsel.

William M. Cohen, Washington, D. C., with whom was Asst. Atty. Gen., Wallace H. Johnson, for defendant. John J. Cain, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KUNZIG and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on defendant's motion, filed May 8, 1973, in accordance with Rule 141(b), requesting that the court adopt the recommended decision filed March 13, 1973, by Trial Commissioner Franklin M. Stone pursuant to Rule 134(h) as the basis for its judgment in this case. Upon consideration thereof, and without oral argument, since the court agrees with the decision, as hereinafter set forth,* it hereby grants defendant's motion of May 8, 1973, and affirms and adopts the decision as the basis for its judgment in this case. Therefore, plaintiffs are not entitled to recover and their petition is dismissed.

## OPINION OF COMMISSIONER

STONE, Commissioner:

Plaintiffs, who are husband and wife, brought this action pursuant to the Fifth Amendment and the Tucker Act, 28 U.S. C. §§ 1346(a)(2) and 1491, seeking just compensation in the amount of $175,000 [1] for the alleged "taking" by defendant of their asserted right of access to a certain tract of land owned by them situated in Cook County, Minnesota. In the interest of brevity, this land (which is more particularly described in finding 3(a), *infra*) hereinafter will be identified and referred to simply as "Lot 5."

The east and north boundary lines of Lot 5 abut the Pigeon River, which is the meandering International Boundary Line between the United States and Canada in this area; and the portions of said Lot of primary concern are in the immediate vicinity of the Pigeon River International Border Crossing between these two countries. Lot 5 is bisected by Minnesota State Highway No.

---

* Whereas the court adopts the Commissioner's separate findings of fact, which are set forth in his report filed March 13, 1973, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

1. The trial of this case was limited to the issues of law and fact relating to the right of plaintiffs to recover, with the determination of the amount of recovery, if any, reserved for further proceedings; however, limited testimony concerning the highest and best use of the land involved herein and the reasonableness and suitability of plaintiffs' access between said

land and an adjoining U.S. highway, was received in evidence because such testimony was relevant to the questions of whether or not the alleged taking of plaintiffs' property caused a substantial diminution of the value thereof and the reasons therefor, which were matters of proof inextricably related to plaintiffs' theory of recovery and the liability issue raised for decision. Defendant introduced no evidence with respect to the issue of damages, taking the position that the introduction of evidence relative to said issue was premature and should be deferred pending the court's resolution of the liability issue. (See finding 2 and n. 1, *infra*.)

61, also designated and known as U.S. Highway No. 61 (hereinafter referred to as "U.S. 61"), which is constructed on a highway right-of-way easement held by the State of Minnesota (State), that extends through and across said Lot from the south in a northeasterly direction.

The alleged taking commenced in June 1966 when defendant, as a part of new United States Customs Inspection Facilities constructed, operated and maintained by the Government, installed chain link fences within the State's right-of-way, which extend from the United States' side of the bridge at the above-mentioned border crossing along both sides of said U.S. 61 to terminal points located some distance short of the west boundary line of Lot 5.

Although plaintiffs' petition alleges a taking of only Lot 5, it is essential to a clear understanding of the discussion that follows to know and keep in mind the fact that plaintiffs own another tract of land (more particularly described in finding 3(c), *infra*), hereinafter identified and referred to in short form as Lot 2, which is located contiguous to the west boundary line of Lot 5; and that the State's aforementioned highway right-of-way and U.S. 61 built thereon also extend clear across Lot 2. It will be apparent from the foregoing that portions of Lots 2 and 5 are located on both the north and south sides of U.S. 61 and front on the right-of-way.

Plaintiffs contend that the alleged taking by defendant of their asserted right of access to Lot 5 substantially impairs the commercial development, and reduces the value, of not only said Lot and Lot 2 but also a total all together of approximately 12,000 acres of land

owned by them situated in the United States and Canada in various areas within a 15-mile radius of the Pigeon River International Border Crossing. Of this total acreage, plaintiffs assert that approximately 1,200 to as much as 1,500 acres thereof are directly involved. However, the testimony and documentary evidence in the record considered as a whole indicate that in addition to Lots 2 and 5, the other lands owned by plaintiffs, which they seriously feel are affected to a substantial degree, include a tract of land identified as Lot 4, which lies south of, and is contiguous to, Lot 5; Lot 3 which lies in a northwesterly direction from, and is contiguous to, Lot 2; and an unspecified number of acres of other lands located north of Lots 2 and 3 in the vicinity of the Pigeon River.[2]

In my opinion, there has been no compensable taking of any of plaintiffs' land or private property rights by defendant and they are not entitled to recover.

Plaintiffs admittedly made arrangements for the purchase of Lots 2, 3, and 5 sometime in 1938 but did not obtain delivery of the deeds thereto until May 1942. At that time there were no roads through or to the lands now in controversy, and the nearest road was "old U. S. 61" which crossed the Pigeon River into Canada at a point approximately 7 miles upstream from the present location of the new U.S. 61. Since 1934, however, the Commissioner of the Minnesota State Highway Department and authorized State officials had proposed that the then existing U.S. 61 should be rerouted as now located. The highway relocation proposal was the subject of

2. Lots 3 and 4 are more particularly described in findings 4 and 5, respectively, *infra*. Lots 2, 3, and 5 are located and depicted as shown in solid green color on Plfs' Ex. 2. Lot 4, which consists of 40 acres, is shown in light green colored hatch marks on said Exhibit. The record does not clearly disclose the number of acres of land included in Lots 2, 3, or 5; but the evidence does show that Lots 2, 4, and 5 comprise a total of approximately 120 acres; and it would appear that none of the numbered lots mentioned above contain in excess of approximately 40 acres, or a total of 160 acres. Reference to Plfs' Exhibits 2, 3, and 4 will be helpful in visualizing and orienting the locations of the several lots and land areas mentioned herein.

considerable controversy engendered by conservation groups, and studies in regard to the project were made by various representatives of the United States Government and the State of Minnesota, over an extended period of time before it was officially approved and authorized. As a result, it was not possible for contracts for construction of the new highway to be let and the roadwork started until 1958. Prior to that time, the State had acquired a necessary highway right-of-way easement from plaintiffs by condemnation.[3]

During 1958 an official of the General Services Administration (GSA) contacted plaintiff Lloyd Johnson to negotiate for the purchase of portions of plaintiffs' lands, including shoreline land areas within Lot 5 and other sites therein, for use in connection with the planned new Customs Inspection Facilities and the construction of several houses to be occupied by Government employees assigned to duty at said facilities. Mr. Johnson indicated his lack of interest in any such sales of plaintiffs' lands in stating that he intended to hold for commercial development, the property desired by the United States Government. However, at the same time Mr. Johnson offered to give the Government access and other rights to the frontage of Lot 5 located on both sides of U.S. 61 within the first 300 feet closest to the Pigeon River, i. e., the east border of said property, provided the Government agreed that proposed new U.S. Customs Facilities would be built within this 300 feet. This offer was not accepted by the Government, and all other negotiations for portions of plaintiffs' property were dropped.

In April 1959 the State of Minnesota filed a petition in the State District Court initiating a condemnation action against plaintiffs to obtain title in fee simple absolute and certain additional rights of access to other portions of the State's aforementioned right-of-way land involved herein, owned in fee simple by plaintiffs, for trunk highway purposes. In October 1960 the State dismissed and discontinued these condemnation proceedings for reasons not disclosed in the record, with the result that there was no taking of any of plaintiffs' remaining property rights by the State in said action.

Construction of new U.S. 61 was finally completed in November 1963 and it was opened to the general public at that time. In the meantime, a temporary Customs and Immigration station was set up on a site located off on one side of this highway at a point approximately one-half mile from the new border bridge crossing over the Pigeon River, for use until a permanent facility could be established.

In March 1965 the United States commenced condemnation proceedings for three small parcels of land lying entirely within the bounds of the State of Minnesota's highway right-of-way easement, for use in connection with the establishment of permanent Customs Inspection and Immigration Facilities. Plaintiff Lloyd Johnson filed an answer in said proceedings alleging, inter alia, that the plans for construction of the facilities also involved denial of his right of access, and praying that the United States be required to include in said proceedings the condemnation of such additional property rights which the Government allegedly contemplated taking. Johnson's claim was dismissed as being prematurely raised in the opinion of the court in the case of Certain Lands in County of Cook, State of Minnesota, supra. Thus, neither the State's dismissed

3. While plaintiffs technically retain a fee simple interest in the land, subject to the State's highway easement, it was concluded by the United States District Court for the District of Minnesota, in United States v. Certain Lands in County of Cook, State of Minnesota, 248 F.Supp. 681 (D.Minn.1965), a case involving portions of this right-of-way, that plaintiffs' remaining interest was substantially equivalent to a possibility of reverter and that they were entitled to only nominal damages for its taking.

1959 condemnation action nor the United States' 1965 condemnation action determined the extent of plaintiffs' right of access to U.S. 61 or their right to compensation, if any, for the alleged taking of said rights. The three small parcels of land were duly condemned by the United States, these being the only portions of land involved herein in which the United States holds title.

The United States, acting through the GSA, applied to and received from the State of Minnesota, a permit dated June 10, 1966, approved and issued by the State's Commissioner, Department of Highways, to construct, operate, and maintain United States Customs Inspection Facilities on the State's right-of-way near the Pigeon River Border Crossing.[4] Included in this permit, *inter alia*, was the right to place and maintain fences and related facilities within the State's right-of-way on both sides of U.S. 61, as appurtenances to said customs facilities. Incident to the construction of said facilities in accordance with State approved plans and specifications, as changed in some instances at the direction of the State, chain link fences were duly installed by defendant along and entirely within the authorized areas of the State's right-of-way on both sides of the highway where the facilities are presently located. These fences extend from the United States' side of the aforementioned border crossing bridge in a westerly direction, a distance of 1,133 feet on the north side of the highway and 1,108 feet on the south side thereof.

As best it can be determined from an incomplete and unsatisfactory record with respect to the distances of certain boundary lines of the lots and portions thereof involved herein, as well as between particular points within these areas of land, the fence on the north side of the highway terminates at a point a short distance west of the main customs inspection station buildings and parking area approximately 175 feet east of the nearest point in the west boundary line of Lot 5; and the fence on the south side of the highway terminates at a point just west of said station approximately 275 feet east of the nearest point in the west boundary line of Lot 5.

It is important to note that the State's right-of-way encompasses *all* of the land in Lot 5 situated on both sides of U.S. 61 within the first 300 feet closest to the border crossing bridge (said land is actually a narrow peninsula shaped in the likeness of an arrowhead with the bridge extending east from the easternmost point of the land). Therefore, in light of the aforestated lengths of the fences, it is apparent that they border on only roughly 800 feet of the some 2,000 feet of the portions of Lots 2 and 5, which front on the north and south sides of the highway. Thus, in excess of approximately 1,200 feet of the parts of said lots divided by the highway and fronting on each side thereof are unobstructed by defendant's fences.

The State of Minnesota Highway Department is initially responsible for designating and granting of access to adjoining land owners along trunk highways such as U.S. 61. Under the terms of the aforementioned permit, the United States has neither the right nor the authority to provide any gates, driveways, or other entrances in the fences for ingress and egress to and from the area encompassed by said fences, without first obtaining permission from the State of Minnesota Highway Department. Plaintiffs, whose property was still undeveloped woodland at the time of the trial, have never applied to said Department or the United States for access between U.S. 61 and their property, either at any point where the fences are located or beyond the ends of the fences. Notwithstanding this fact, in building the highway, which starts out from the

4. This permit (Def's Ex. 1—see finding 15(a), *infra*) specifically superseded and voided all similar permits previously issued to defendant, specifically and especially a permit dated June 30, 1965.

border crossing bridge as an undivided double lane road but becomes divided in the immediate vicinity of the customs checkpoint station so that road lanes pass on the north and south sides thereof, the State provided stub-end entrances into plaintiffs' property, as well as a turnaround through the median strip between the north and south lanes of the highway. These approaches are located at points in Lot 2 a distance of approximately 1,530 feet west of the bridge or roughly some 400 feet from the west terminal points of the fences. There is nothing in the record to suggest that the State would not provide or permit the construction of additional approaches at points closer to said terminal points if plaintiffs requested that the State take or approve such action.

Mr. Leo H. Tscheda, a District Right-of-Way Engineer of the Minnesota State Highway Department, presented credible and unrebutted testimony on behalf of defendant to the effect that the State has an established policy of not permitting access to a State highway at a point within 800 to 900 feet from a bridge under normal circumstances, but the distance may be shorter or greater depending on the facts of the particular situation. This witness further stated that the aforementioned State permit issued to defendant allowed it to construct the approximately 1,100 foot fences, despite the fact they would deny a greater amount of access than the normal standard of 800 to 900 feet, because of the necessity of restricting and forcing persons entering the United States from Canada to pass through the Customs Inspection station.

Plaintiff Lloyd Johnson testified that plaintiffs long have planned to develop their property adjacent to U.S. 61 with commercial, tourist-oriented facilities. He stated that plaintiffs "would expect to have" a motel, restaurant, gas service station, and related facilities located in an area on the south side of the highway at the east end of that part of Lot 5 which fronts on the Pigeon River; that a tavern, ice cream stand, Indian Village-Museum, gift and other type shops, parking areas for trailers and campers, excursion boats, and other miscellaneous facilities are to be located within the portions of Lots 2 and 5 lying on the north side of the highway; and that consideration had been given to providing other tourist attractions and facilities at various locations in areas which include historical sites and scenic views, particularly in the vicinity of the Pigeon River and certain falls situated within or in close proximity to the lands owned by plaintiffs. According to Mr. Johnson, such facilities would put plaintiffs' property to its "highest and best use" as they would attract passing tourist traffic.

Although the fences constructed by defendant obstruct only about 40 percent of the potential access to the divided portions of Lots 2 and 5, which front on the north and south sides of U.S. 61, plaintiffs contend that to attain the maximum tourist and other business potential of the planned development complex, it is essential that there be *unlimited access* through which the so-called "impulse stopper" traveler, *i.e.*, one who will make an "impulse stop" after he first sees the development, can enter plaintiffs' property from the highway. Plaintiffs further contend that the most important areas of access for attracting the "impulse stopper" are those portions of Lot 5 which are closest to the border crossing bridge, because these are the areas in which the motorist traveling on the highway can most fully view and appreciate the scenic topographical features of the site area, *i.e.*, the river and its frontage. With respect to this contention, it is important to mention that Mr. Johnson testified that a person traveling east on the highway would not be able to see said site area until he reached a point east of the main customs inspection station building, which is lo-

cated a distance of approximately 800 feet west of the bridge.[5]

Plaintiffs' asserted loss of the impulse stopper business theory is not substantiated or corroborated by any other oral testimony or documentary evidence. Nonetheless, plaintiffs assert that because of the purported loss of the prospective "impulse stopper," the consequences is a substantial diminution of the highest and best use of their property. As a result, they contend that the physical obstruction of a portion of their potential access constitutes a taking of private property by defendant for public purposes, for which they are entitled to just compensation in accordance with the Fifth Amendment to the Constitution.

Defendant, in addition to denying that there has been a compensable taking, asserts that even if there was a taking, the United States is not liable because it acted only as a *permittee* of the State of Minnesota. Since the question of whether the United States or the State of Minnesota is liable for the taking becomes relevant only if there has in fact been a "taking," consideration of the permittee issue will be deferred and it shall be assumed, *arguendo*, that the actions found herein are the direct responsibility of defendant.

That a portion of plaintiffs' access is physically obstructed by defendant's fences is not denied. However, in Finks v. United States, 395 F.2d 999, 1004, 184 Ct.Cl. 480, 489, cert. denied, 393 U.S. 960, 89 S.Ct. 398, 21 L.Ed.2d 374 (1968), this court noted that

 * * * not every deprivation of use, possession, or control is a "taking". It is the character and extent of an invasion of property rights which are determinative. [Cites omitted.] It is equally clear that not all takings of property are compensable.

In Franco-Italian Packing Co. v. United States, 128 F.Supp. 408, 413–414, 130 Ct. Cl. 736, 745–746 (1955), this court commented on noncompensable "takings" as follows:

 * * * [E]xercise of * * * [United States'] regulatory and police powers, * * * [does] not fall within the fifth amendment limitation, although taking of private property often resulted. [Cites omitted.]

The distinction between an exercise of the eminent domain power that is compensable under the fifth amendment and an exercise of the police power is that in a compensable exercise of the eminent domain power, a property interest is taken from the owner and *applied to the public use because the use of such property is beneficial to the public* * * * [whereas] in the exercise of the police power, *the owner's property interest is restricted or infringed upon because his continued use of the property is or would otherwise be injurious to the public welfare.* * * * [Emphasis added.]

In applying the foregoing principles to the facts of the instant case, it is apparent that defendant has a genuine, valid interest in controlling and regulating the flow of traffic that enters and leaves the United States. That the fences are a necessary and justifiable part of this regulation cannot be seriously denied. The possibility of persons —particularly upon entrance—circumventing the inspection facility, if access roads were permitted between the bridge and said facility, suggests possibilities of abuse too obvious to bear further comment.

■ Defendant has only imposed those restrictions on potential access which are necessary and reasonable under the circumstances. Plaintiffs' con-

---

5. It is important to recall Mr. Tscheda's unrebutted testimony, *supra*, that the policy of the Minnesota State Highway Department is always to deny access within the first 800 to 900 feet of a bridge, and even a longer distance where special circumstances merit such action.

tention that the fences are longer than necessary is unsupported by the evidence. The fact that defendant's older Customs Inspection and Immigration facilities and fences provided there were closer to the border than the facilities involved herein is not persuasive. The demands of increased traffic and the need for greater efficiency makes it readily apparent that the length of the fences involved herein is not unreasonable or unduly oppressive in view of the intended purpose therefor. Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S. Ct. 987, 8 L.Ed.2d 130 (1962); Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894).

Here, the plaintiffs' potential access has not been "taken" and applied to the public use, but rather is "restricted" or infringed upon because their use of that access would be injurious to the public welfare. Thus, we are confronted with an exercise of the police power, and not an uncompensated exercise of eminent domain.

Notwithstanding the necessity of restrictions promulgated pursuant to the exercise of the police power, it was recognized in United States v. Central Eureka Mining Co., 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958) that:

> * * * action in the form of regulation can so diminish the value of property as to constitute a taking. [Cites omitted.] However, *the mere fact that the regulation deprives the property owner of the most profitable use of his property is not necessarily enough to establish the owner's right to compensation.* [Emphasis added.][6]

The general test of whether a restriction is so excessive as to result in a substantial diminution of property value must be applied in conjunction with those cases which have specifically dealt with the right of access. Specifically, it must be determined whether the plaintiffs in fact had a "right of access" in the obstructed area, which could be the subject of a taking, *i.e.,* excessive regulation.

■ Although the issue of what constitutes a "taking" is a "Federal question" which is governed entirely by Federal law, the meaning of "property," as used in the Fifth Amendment, will normally obtain its content by reference to State law. United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946). Consequently, in considering whether plaintiffs' potential access amounted to a compensable property right, the subsequent analysis will refer to Minnesota State law as well as Federal authorities.

Plaintiffs contend that the "right of access" has been recognized throughout the United States as a property right which cannot be taken or materially interfered with without just compensation. Creasey v. Stevens, 160 F.Supp. 404 (W.D.Pa.1958), rev'd on other grounds, sub nom. Martin v. Creasey, 360 U.S. 219, 79 S.Ct. 1034, 3 L.Ed.2d 1186 (1959); Hendrickson v. State, 267 Minn. 436, 127 N.W.2d 165 (1964). On the other hand, defendant contends that the property owner is not entitled to more than one outlet from his property and cannot complain if he is not given the shortest way out. United States v. Alderson, 53 F.Supp. 528 (S.D.W.Va. 1944); State of Washington v. United States, 214 F.2d 33 (9th Cir.), cert. denied, 348 U.S. 862, 75 S.Ct. 86, 99 L.Ed. 679 (1954); Winn v. United States, 272 F.2d 282 (9th Cir. 1959); and Ralph v. Hazen, 68 App.D.C. 55, 93 F.2d 68 (1937).

■ While seemingly the foregoing dicta represent somewhat conflicting positions, a study of the case law reveals to the contrary that the statements are readily reconcilable. An abutting landowner on a public highway has a special right of easement in the public road for access purposes, but the owner is not en-

---

6. *See also* United States v. Pewee Coal Co., 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951); Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

titled to access to his land at any and all points in the boundary between it and the highway. United States v. Certain Land in the City of Newark, 314 F. Supp. 836 (D.N.J. 1970), aff'd 439 F.2d 670 (3d Cir. 1971). That is, the abutter's easement entitles him to some means of access from the adjoining highway, "but such owner cannot insist on the right of ingress and egress at any place he sees fit as he holds his right subject to the superior right of the state [to impose reasonable regulations and restrictions]." King v. Stark County, 66 N.D. 467, 266 N.W. 654 (1936), cited with approval by the Minnesota Supreme Court in Petition of Burnquist, 220 Minn. 48, 19 N.W.2d 394 (1945). Accordingly, in instances where an abutting landowner *is totally deprived* of his access to an existing road, *i.e.*, a "way of necessity," the courts have generally found a compensable taking. *See, e.g.*, Creasey v. Stevens, *supra*; Bickel v. Indiana Toll Road Comm., 145 F.Supp. 257 (N.D.Ind.1956); and Bydlon v. United States, 175 F.Supp. 891, 146 Ct.Cl. 764 (1959). Since plaintiffs have not been totally deprived of access to their property, it is clear that they do not come within the purview of these cases.

In those situations where, as here, reasonable regulations and restrictions have been imposed upon the abutting owners, which obstruct portions of their access yet do not totally deprive such owners of access, the question becomes one of whether there remains a reasonably convenient and suitable alternative means of access under all of the existing facts and circumstances. Certain Land in the City of Newark, 439 F.2d 670 (3d Cir. 1971), aff'g 314 F.Supp. 836, *supra*; Hendrickson v. State, *supra*. Therefore, the "right of access" is not an unlimited right to access at any and all points in the boundary between an abutter's land and the highway, but instead is a right to a reasonably convenient and suitable means of access.

One of the crucial factors to be considered in determining the reasonableness of the access is whether the partial deprivation has resulted in a substantial diminution of value of the property, which, as noted previously, is also a determinative of whether a regulation is so excessive as to constitute a "taking." Thus, if it is determined that plaintiffs' land has not suffered a substantial diminution in value and plaintiffs, as a result, enjoy reasonably convenient and suitable access, then it must be concluded that (1) they did not have a "property right" in that which has been denied, and (2) there could not have been a "taking" since (a) plaintiffs have not been denied anything to which they were entitled, and (b) the regulation has not been proven to be excessive.

Plaintiffs rely heavily on *Hendrickson, supra,* in which a landowner had a motel on an existing highway which was subsequently converted to a limited access highway. Although a service road was provided that furnished the motel circuitous access in lieu of the direct access which he had previously enjoyed, the court noted:

* * * The accessibility to the property from the highway and its proximity to the city of Rochester attracted the patronage of the traveling public and gave the property a *special status* which may entitle the owners to damages notwithstanding the circuitous access afforded by a service road. * * * [Emphasis added.] [127 N.W.2d at 171.]

Plaintiffs contend that their property also has a *special status* which is impaired by the deprivation of complete access. However, in my view, *Hendrickson* is readily distinguishable and, if anything, supportive of a contra conclusion. Plaintiffs in the present case, unlike the motel owner in *Hendrickson*, did not *previously* enjoy "accessibility to the property" or the "patronage of the traveling public," which might create a "special status." To the contrary, it has been shown that prior to the completion of the present route of U. S. 61, plaintiffs' property was totally inaccessible; and it may be reasonably assumed that the same was of considerably lower commercial value than it now holds. Nor do the plaintiffs at bar have any

type of commercial venture, which has enjoyed the "patronage of the traveling public." As the court in *Hendrickson* also stated, "a property owner has no vested interest in the continued flow of the main stream of through traffic, and the state may divert it to a new location without being liable for consequential economic losses which owners abutting on the old highway sustain." 127 N.W.2d at 170. It seems clear that if property owners with established businesses cannot recover for consequential losses resulting from diversion of traffic, except for unique situations as that presented in *Hendrickson*, plaintiffs herein are no more entitled to such damages when they have not even as yet put their property to commercial use.

While plaintiffs have referred to cases in which property owners lost all or a portion of their *previous* access to an existing highway, the situation presented in the instant case is found to be more analogous to those cases in which a *new* limited access highway or expressway has been constructed through property where *no previous road existed*, and the abutting property owners are denied access pursuant to the state's regulatory, police power. Such cases have concluded that damages may not be awarded to landowners even where this may constitute a lack of consequential benefit. *See* State Highway Dept. v. Ford, 112 Ga. App. 270, 144 S.E.2d 924 (1965) and cases cited therein. Although cases such as *Ford* are concerned in part with the validity of state statutes pertaining to limited access highways, the underlying principle is the same regardless, *i.e.*, the landowner cannot complain of a taking of that which he never had and the Sovereign refuses to give because the general public interest is best served by such denial.[7]

The situation herein is analogous to the new limited access highway cases in that it was apparent to all involved here that the rerouting of U.S. 61 would require new United States Customs Inspection facilities at the present Pi-geon River Border Crossing bridge upon completion of said highway. That is, plaintiffs had no reason to expect that they would ever have entrance to their property in this area after the proposed new facility was provided. The fact that Mr. Johnson foresaw the probability of not having such access is evidenced, as previously mentioned, by his admitted attempt in 1958 to persuade the GSA authorities to place the facility within the first 300 feet closest to the Pigeon River Bridge, with the understanding that buildings would not be located further west of this point. Even though plaintiffs undoubtedly recognized that they would not have access in this area, they now present this court with a speculative scheme as to what the enhanced value of the property would be if not for the presence of the necessary United States' facilities and its requisite, appurtenant fences. In effect, plaintiffs are willing to accept the appreciation in property value which the addition of this road brought, but are unwilling to accept the necessary limitations which are inherent in its existence. Under these facts, plaintiffs' contention that they have suffered a substantial diminution in value of their property cannot be sustained for, as noted by the Supreme Court in United States v. Sponenbarger, 308 U.S. 256, 266–267, 60 S. Ct. 225, 229, 84 L.Ed. 230 (1939):

> \* \* \* if governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty. \* \* \*

The circumstances show sufficient nexus between the addition of U.S. 61 and the erection of defendant's fences, such that plaintiffs cannot base a taking claim on the theory that they may garner the benefits conferred by the former without deduction for whatever detriment that may arise out of the presence of the latter. John B. Hardwicke Co. v. United States, 467 F.2d 488, 199 Ct.Cl. 388 (1972). The rule that the

7. In this connection, see n. 5, *supra*.

Sovereign must pay only for what it takes, not for the opportunities which the owner may lose, is applicable here. United States ex rel. Tenn. Valley Auth. v. Powelson, 319 U.S. 266, 283, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943); A. G. Davis Ice Co. v. United States, 362 F.2d 934 (1st Cir. 1966).

Under all of the facts and circumstances in this case, it is concluded that plaintiffs' property has not sustained a substantial diminution in value and that they have reasonably convenient and suitable access, even in the light of the property's highest and best use. Thus, it must be concluded as a matter of law that defendant is not liable for a compensable taking within the meaning of the Fifth Amendment. In view of the aforestated conclusion, it is unnecessary to consider whether the defendant acted solely as a permittee of the State of Minnesota.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and the petition is dismissed.