**PAULEY PETROLEUM INC. et al.**

v.

**The UNITED STATES.**

No. 197–69.

United States Court of Claims.

Jan. 24, 1979.

John P. Ohl, New York City, attorney of record, for plaintiffs. H. Richard Schumacher, Frank W. Krogh, Cahill, Gordon & Reindel, New York City, and Edward Kliewer, Jr., Dallas, Tex., of counsel.

Myles E. Flint, Washington, D.C., with whom was Asst. Atty. Gen., James W. Moorman, Washington, D.C., for defendant.

Before DAVIS, NICHOLS, KUNZIG, BENNETT, and SMITH, Judges, en banc.

## OPINION

DAVIS, Judge:

Claimants are oil-company lessees of federal offshore lands in Santa Barbara Channel, California. Late in January 1969 there occurred, on another leasehold in that area, a very serious oil blowout. Plaintiffs' leaseholds were not physically affected by that incident but their contention is that their leasehold rights were frustrated, violated, and taken by the Government's conduct following the blowout.

The case was tried before Trial Judge Hogenson who has made extensive and careful findings of fact which we adopt without substantial change.[1] In Part I of this opinion, we summarize the facts pertinent to our decision. Part II deals with a preliminary jurisdictional issue. In Part III we review the arguments for recovery presented by the companies, including a late motion setting forth an additional, more restricted, theory of damages.

### I

### The Facts

A. *The leases, and initial unsuccessful drilling (March 1968–January 1969):* Plaintiffs make up a consortium of oil corporations which acquired from the Government two leases, numbered OCS–P–0218 and OCS–P–0226 (covering tracts 375 and 384 respectively), of submerged lands on the outer continental shelf in Santa Barbara Channel, off California. After purchase of the leaseholds in 1968 and various assignments of interests in that year, each company retained a percentage ownership ranging from 15.3% to 2.5% in either or both tracts 375 and 384.

In the fall of 1967 notice for bids on outer continental shelf land in the Santa Barbara Channel was published. Pauley Petroleum Inc. (Pauley) and other associated companies bid and won the two leases. Before

[1]. Because of their length, we do not print the findings although we adopt them with minor modifications. By direction of the court, the trial judge limited himself to making factual findings.

bidding Pauley and some other companies in the joint venture had conducted extensive exploration of the area. The leases were executed in March 1968. Pauley and the original lessees paid $43,503,147 and $30,351,447 in bonuses for tracts 375 and 384, respectively. In addition, they were required to pay $17,280 per annum for the basic five-year term of each lease as a minimum rent. After winning the bid, the consortium selected Pauley as the "operator" for the purposes of managing exploration and drilling, and established an operating committee to supervise all exploration and development activities.

Under the Outer Continental Shelf Lands Act, Pub.L.No.212, 83d Cong., 1st Sess., 43 U.S.C. §§ 1331–1343 (1970) (OCS Act), the legislation authorizing plaintiffs' oil leases, the Interior Department is the governmental agency with general cognizance of operations under the leases, and the Secretary has from time to time issued regulations and orders relating to drilling and operations on the outer continental shelf. The leases themselves were on a standard Interior form which granted an exclusive right to drill and extract oil and gas. Lessees were also given the right to erect drilling platforms and conduct geological explorations. Each lease was made subject to the OCS Act, and stated that all reasonable regulations were made a part of the lease " * * * when not inconsistent with any express and specific provisions herein, which are made a part hereof."

With Interior's consent, the Pauley group conducted exploration of the two tracts during the period from March 1968 through January 1969. The exploration involved drilling of eight wells, seven on tract 373 (including one redrill) and one on tract 384, and the total drilling costs came to approximately $3.8 million. All eight wells were dry holes, none producing oil in commercially usable quantities. The trial judge found, and we agree, that "the abandonment of all of the exploratory wells as not commercially producible had to be discouraging to the plaintiffs." Several of the participants reflected their disappointment by selling their investments cheaply, writing all or part of them off, or amortizing them over the lease-terms.[2] However, this unsuccessful drilling did indicate the presence of hydrocarbons, signifying the possibility of oil reserves. Serious differences exist among the expert witnesses as to the interpretation of the hydrocarbon deposits and the potential value of any possible reservoirs of oil.

B. *The oil spill, government suspension of operations, imposition of new regulations, orders, and filing procedures (January 28, 1969–April 9, 1969):* On January 28, 1969, a Union Oil well on outer continental shelf lands in the Santa Barbara Channel blew out, creating an oil slick of about fifty square miles which caused severe property and environmental damage. There immediately developed a political climate of great concern over any future drilling on continental shelf lands in the Channel. A further consequence of the Union Oil disaster was the collapse of the insurance market covering damages caused by offshore oil spills.[3]

2. As to three (Kewanee, TransOcean, and Ashland), our finding is "that such parties had lost their enthusiasm about the success of the exploratory operations, and did not share the optimistically high values of subject tracts as potential reservoir areas as presented by the original plaintiffs in the trial of this case." Another company (Colorado) told its stockholders, in its report for 1968, that it had written off the leasehold and drilling costs on these tracts because the leases did not have reserves capable of commercial production. Husky reported to its stockholders that the economies of development of these leases were marginal. Midwest and Pauley also wrote off or amortized significant investment costs. Out of twelve companies holding interests in the two tracts, seven offered to sell, sold, or wrote off all or a substantial part of their investment by early 1969.

3. Plaintiffs conceded at oral argument that the collapse of the insurance market covering offshore oil spills was not caused by any of the government regulations or actions subsequent to the Union Oil blowout. Rather, the collapse was the direct result of a series of costly oil spill accidents, capped by the Santa Barbara blowout. Our finding attributes this collapse of the insurance market to the Union well blowout and oil spill, not to the subsequent governmental actions.

The most critical events for this case all occurred between the oil spill on January 28, 1969, and plaintiffs' filing of this suit on April 9, 1969—a period of somewhat over two months. Without giving unnecessary details, we shall itemize the principal government actions during this period, many of which plaintiffs emphasize in this litigation.

1. From January 28 to February 3, 1969, all oil companies which had operating wells in the Santa Barbara Channel at the time of the Union Oil blowout—plaintiffs were not among them—suspended operations voluntarily at the Secretary of the Interior's request, pending a review of conditions there by the Government. After initially clearing these companies for resumption of drilling on February 3rd, Secretary Hickel, under sharp political criticism, reversed himself and on February 7th sent telegrams to the five companies then operating, ordering them to cease all drilling and production. Pauley, which was not then operating a well, did not receive a telegram.[4] During this period, Secretary Hickel informed Dr. Pecora, Director of the Geological Survey in charge of offshore oil regulations, that Hickel wanted three programs implemented: (1) a determination of the cause of and methods to stop the oil spill; (2) review of all relevant regulations and orders; (3) review of the sufficiency of information given by lessees to the Geological Survey. Dr. Pecora began implementing Hickel's program by establishing three task forces. Two of these task forces were devoted to point 1 of Hickel's program, and the third was responsible for point 3—reviewing the sufficiency of technical information provided by lessees. Dr. Pecora himself led a

review with various Interior Department officials of existing regulations and orders.

Also on February 7, 1969, Secretary Hickel imposed further requirements for clearing future drilling in the Santa Barbara outer continental shelf. He instructed Dr. Pecora that all actions on Santa Barbara leases were to be cleared directly through the Secretary's office. Dr. Pecora by phone so informed the Geological Survey regional supervisor for the Pacific, who prior to that time had been delegated direct authority to grant drilling permits.

2. The federal action which most concerned plaintiffs was the promulgation of a new regulation relating to a lessee's liability for oil spills. This was published in the Federal Register on February 21, 1969, adding a new subparagraph (b) to 30 C.F.R. § 250.42, as follows:

> If the waters of the high seas are polluted by the drilling or production operations of the lessee, and such pollution damages or threatens to damage aquatic life, wildlife, or public or private property, the control and removal of the pollutant and the reparation of any damage, to whomsoever occurring, proximately resulting therefrom shall be at the expense of the lessee * * *

34 *Fed.Reg.* 2503–2504 (1969).

(As indicated in Part III, A, *infra*, a proposal to change this regulation was announced early in May 1969 and a modification was made in August 1969.)

Pauley apparently interpreted the new regulation to impose absolute liability not only for costs of cleanup, but also for any damage to a third party's property from an oil spill (no matter how caused), and that such liability applied retroactively to exist-

---

4. On February 10, 1969, Pauley sent a telegram to Secretary Hickel, referring to Hickel's February 7th telegram ordering the then-operating oil companies to suspend operations. Pauley's telegram stated that it was ready to drill and asked for Secretary Hickel's position. The Government's response to the telegram is unclear. The Director of the Geological Survey, Dr. Pecora, saw the telegram and the telegram bears a handwritten notation that Pecora advised the Geological Survey regional supervisor to respond, by emphasizing that a "detailed

review for safety factors requires deferment of decision to resume operations." Dr. Pecora does not recall specifically discussing the telegram with the regional supervisor and apparently no official response was received by Pauley. The telegram also contains a written notation by Dr. Pecora that a general telegram detailing additional information required from Pauley would be sent, and a subsequent separate notation that such a telegram was sent on March 1, 1969.

ing leases.[5] On March 12, 1969, a special meeting of the Pauley group's operating committee was held, and one of the primary items on the agenda was a discussion of problems caused by the alleged change in the standard of liability. Pauley announced that it had retained a law firm, and after a presentation by a member of the firm, it was decided that the necessary papers for filing a lawsuit would be prepared immediately. Two members of the lessee group stated that they would join the suit, and all other members were to advise Pauley as soon as possible as to their decision. The minutes of the meeting reveal that most of the members present stated they would not participate in further Santa Barbara drilling while the presumed "absolute liability" regulation remained in effect.

3. On February 11, 1969, the Pauley group filed with the Geological Survey's Los Angeles office an application for a permit to drill a second well on tract 384. One of plaintiffs' major complaints is that this application was never acted upon. During February and March 1969, it is clear, Interior was in the process of revising its orders controlling drilling for and operating oil wells on the outer continental shelf (so-called "OCS orders"); the Pauley group was aware that such a process was going on. On March 28, 1969, OCS Order No. 10 was promulgated, terminating the prior OCS Order on the subject, and imposing more stringent requirements for casing, cementing, mud drilling and blowout procedures. Order No. 10 stated that no drilling would be allowed until all pipelines used to transport oil to shore facilities were inspected by the Geological Survey. The order did not say expressly that its requirements were retrospective but it did state that each application to drill had to fulfill the new requirements. On April 4, 1969 copies of OCS Order No. 10 were provided to all OCS lessees in the Santa Barbara Channel. The Pauley group never amended its February 11th application (to drill a second well on tract 384) so as to accord with Order No. 10.

4. Under the Secretary's program, Interior also sought further physical information from the Santa Barbara Channel lessees who were directed, on March 1, 1969, to furnish "all available geological, geophysical and structural information." The returns were studied on a lease-by-lease basis and reports thereon were submitted to the Secretary to aid in future clearances for drilling in the Channel. On March 21st, the Secretary indicated that, as soon as detailed studies were completed on the basis of this new information, the oil companies would be allowed to resume operations in their present locations.

The Pauley group delayed its response to this demand and never fully answered. On March 12, 1969, this matter was discussed at a special meeting of the group's operating committee. The minutes state:

It was decided that the decision as to whether or not we furnish the geological geophysical and structural information demanded by the Secretary of Interior would be held in abeyance until final decision has been made regarding the filing of the proposed lawsuit.

A few days later, Pauley, as operator, repeated this idea in a letter to one co-lessee, with copies to all the others. Pauley also twice told the Geological Survey that it understood that the demand for new data did not apply to the Pauley group unless a drilling permit was sought and required. The Geological Survey agreed with this understanding. On April 4, 1969, five days before the institution of the suit, Pauley furnished some but not the complete data called for by Interior. Although the trans-

---

5. The precise understanding of the change by Pauley (and its co-lessees) is difficult to pinpoint. In a memorandum to all partners dated February 24, 1969, Pauley exhibited some confusion as to the coverage of the revised liability standard:

As it now stands, the industry is liable for all damage whether or not any negligence or

fault existed. However, I believe this rule 250.42 [the amended regulation] applies everywhere. The point is not too clear. This February 24th memorandum also demonstrates that, almost immediately after promulgation of the new regulation, Pauley was investigating a possible lawsuit by the consortium.

mittal letter said that the Pauley group would provide additional information as needed, it never sent all the data sought by Interior.[6]

On April 1, 1969, Secretary Hickel, after receiving additional information from his task force clearance program, approved for renewed operations five leases in the Santa Barbara Channel, four of which had been earlier suspended. Most other oil companies supplied the additional information required under the clearance program and ultimately had their leases cleared. After clearance, the Geological Survey regional supervisor had authority to grant drilling permits and operations on the leases pursuant to the normal regulations, as amended. In fact, some actual drilling on other outer continental shelf leaseholds in the Channel was resumed as early as April 1969. *See Sun Oil Co. v. United States*, 572 F.2d 786, 797, 798, 215 Ct.Cl. 716, 732–35 (1978).

C. *The filing of this suit (April 9, 1969):* The petition in this court was filed on April 9, 1969, raising as its foremost claim that the new regulation promulgated on February 21, 1969—said to impose for the first time an "absolute liability" standard for oil pollution—made plaintiffs' leases economically worthless and exposed them to unmeasurable risks. Only six of the lessees joined in the petition.[7] The remaining partners[8] were later joined as involuntary plaintiffs; for the most part they did not participate substantially in the proceedings but they have adopted the position of the original plaintiffs. After the petition was filed, there appears to have been no substantial communication between the Pauley group and Interior with respect to the leases except in connection with the litigation, and except that plaintiffs paid their annual rent of $17,280 (per lease) until the basic five-year term of the leases expired in 1973.

Claimants have tried and present four theories of government responsibility: first, that by changing the lessees' standard of liability in February 1969, the Government frustrated the purposes of the leases; second, that if the liability standard had all along been "absolute liability," plaintiffs are entitled to restitution for mutual mistake because both sides were unaware that that was the standard; third, that the Government breached the leases by various acts; and, fourth, that the Government in effect took the leases by eminent domain and must pay just compensation.

## II

### *Jurisdiction*

■ Before considering the merits, it is necessary to evaluate defendant's arguments that this court lacks jurisdiction over plaintiffs' two claims based on frustration and mutual mistake. The first of these positions is that the claim for rescission because of commercial frustration is really a type of declaratory judgment action, over which this court has no jurisdiction. *See United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). Defendant points to a paragraph of plaintiffs' petition stating that plaintiffs are willing to " * * * submit their interests in the leases to the jurisdiction of the Court and subject them to such orders as the Court deems fit and proper in the premises." It is said that this part of plaintiffs' claim is really a request for rescission and for a declaration of rights—a petition for a declaratory judgment. But defendant blinds itself to the preceding paragraph of plaintiffs' petition on frustration, which asks for a monetary award of some $73 million in bonus payments and some sixty-nine thousand in rental fees for the two leases. This

---

**6.** Although plaintiffs assert they had already filed all required information, the Trial Judge found, and we agree, that plaintiffs did not fully supply the information requested by Interior in March 1969.

**7.** These were: Pauley Petroleum Incorporated, Colorado Oil and Gas Corporation, Mesa Petroleum Company, McCullough Oil Corporation of

California, J. M. Huber Corporation, and Husky Oil Company of Delaware.

**8.** Midwest Oil Corporation, Kewanee Oil Company, Ashland Oil and Refining Company, Macdonald Oil Corporation, and Forest Oil Corporation.

is clearly more than a mere request for declaratory orders by the court; it is a demand for a money judgment. Since plaintiffs found their express request for a money judgment on two of the jurisdictional bases of the Tucker Act—"any Act of Congress * * * or upon any express or implied contract * * * "—it is clear that this court has jurisdiction. 28 U.S.C. § 1491 (1976); *see Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007, 178 Ct.Cl. 599, 605 (1967).

Moreover, the Government advances an erroneous syllogism:

1) The Supreme Court in *King* held that the Court of Claims has no jurisdiction to issue declaratory judgments;

2) In order to reach a judgment plaintiffs ask for a declaration of their rights under the leases;

3) A declaration of rights is a declaratory judgment and therefore the Court of Claims lacks jurisdiction.

■ The crucial flaw is, of course, the equation of a ruling on plaintiffs' rights under the leases with a declaratory judgment. A declaratory judgment is a particular statutory remedy allowing a court to state the legal rights of the parties without regard to a monetary remedy or the grant of specific relief. Such monetary or specific remedy may later flow from the court's declaration, but it need not follow, and if it does it is a separate, subsequent offspring of the primary declaration. *See* 28 U.S.C. §§ 2201–2202 (1976); *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 190, 81 L.Ed. 395 (1937); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). The classic illustration of a declaration without regard for possible monetary remedies is *United States v. King*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed. 52 (1969). There this court found that it could not grant a money judgment because King's monetary claim was time-barred under the statute of limitations. However, the court mistakenly thought that it could issue a declaration that King was entitled to a change in his military retirement status. *King v. United States*,

182 Ct.Cl. 631, 633–34, 660–62, 390 F.2d 894, 896–97, 913–15 (1968), *rev'd*, 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). Here, on the other hand, plaintiffs explicitly seek a monetary remedy—return of over 73 million dollars, or more. They are not asking for a simple declaration of rights in their leases which may or may not result in a subsequent payment of money outside of the court's processes. As we recognized in *Gentry v. United States*, 546 F.2d 343, 212 Ct.Cl. 1 (1976), merely because the court must make a ruling of law (in *Gentry*, declaring a statutory provision unconstitutional) in order to arrive at a money judgment does not render this court's decision a "declaratory judgment" banned under *King*. *See* 546 F.2d at 345–46, 212 Ct.Cl. at 7–8.

■ Defendant's second jurisdictional attack—that plaintiffs' claim for rescission because of mutual mistake or frustration is an equitable action—is based on the incorrect premise that the Court of Claims has no equity jurisdiction. This assumption we have previously described as an "ancient but inaccurate shibboleth." *Quinault Allottee Ass'n v. United States*, 453 F.2d 1272, 1274 n. 1, 197 Ct.Cl. 134, 138 n. 1 (1972). The correct postulate, as *Quinault* observed, is that this court has no jurisdiction to grant specific equitable relief. *Id.* This principle does not preclude the courts from exercising equitable powers as "an incident of our general jurisdiction." *Klamath & Modoc Tribes v. United States*, 174 Ct.Cl. 483, 488 (1966). Equitable doctrines can be employed incidentally to this court's general monetary jurisdiction either as equitable procedures to arrive at a money judgment, *Klamath & Modoc Tribes v. United States*, 174 Ct.Cl. 483, 490 (1966) (use of accounting to aid in rendering money judgment); *Quinault Allottee Ass'n v. United States*, 453 F.2d 1272, 1274 & n. 1, 197 Ct.Cl. 134, 137–38 & n. 1 (1972) (power to use class action procedures to arrive at money judgment), or as substantive principles on which to base the award of a money judgment. *See e. g., United States v. Milliken Imprinting Co.*, 202 U.S. 168, 173–74, 26 S.Ct. 572, 50 L.Ed. 980 (1906) (reformation of contract as

basis of money judgment); *South Boston Iron Works v. United States,* 34 Ct.Cl. 174 (1899) (mutual mistake in final written contract term's as basis for money judgment); *Iowa-Wisconsin Bridge Co. v. United States,* 84 F.Supp. 852, 862–63, 114 Ct.Cl. 465, 504 (1949), *cert. denied,* 339 U.S. 982, 70 S.Ct. 1020, 94 L.Ed. 1386 (1950) (reformation of deed to include reservation of defendant's easement as basis of money judgment).

As originally enacted, the Tucker Act specifically permitted the use of equity doctrines to arrive at a pecuniary judgment. The original version of the Act gave this Court jurisdiction over all claims based upon the constitution, laws, regulations, or contracts with the United States " * * * in respect of which claims the party would be entitled to redress against the United States either in a court of law, *equity,* or admiralty * * * " Act of March 3, 1887 (Tucker Act), ch. 359, § 1, 24 Stat. 505 (emphasis added). The Supreme Court in *United States v. Jones,* 131 U.S. 1, 9 S.Ct. 669, 33 L.Ed. 90 (1888), held that this language did not cover the award of equitable *remedies,* but the Court also held that the statutory language allowed the court to consider equitable principles as a basis for awarding money judgments:

> It seems, therefore, that in the point of providing only for money decrees and money judgments, the law is unchanged, merely being so extended as to include claims for money arising out of equitable and maritime as well as legal demands. *Id.* at 18, 9 S.Ct. at 671.

In *United States v. Milliken Imprinting Co.,* 202 U.S. 168, 26 S.Ct. 572, 50 L.Ed. 980 (1906), the Court speaking through Mr. Justice Holmes, expressly held that under a "fairly liberal interpretation" of the then-existing Tucker Act, the Court of Claims had jurisdiction to reform a contract in order to arrive at a money judgment. *Id.* at 173–74, 26 S.Ct. at 573. The particular language in the Tucker Act upon which both the *Jones* and *Milliken* courts relied, " * * * in respect of which claims the party would be entitled to redress against the United States either in a court of law, equity, or admiralty * * * ", was omitted in the 1948 recodification, but the Reviser's Note clearly indicated that no substantive change was intended.[9]

■ This court has always construed the 1948 version of the Tucker Act as continuing the previously established use of equitable doctrines. *E. g., Iowa-Wisconsin Bridge Co. v. United States,* 84 F.Supp. 852, 862–63, 114 Ct.Cl. 464, 504 (1949), *cert. denied,* 339 U.S. 982, 70 S.Ct. 1020, 94 L.Ed. 1386 (1950); *Klamath & Modoc Tribes v. United States,* 174 Ct.Cl. 483, 490 (1966). Often, the court has awarded (or denied) a money judgment based upon an equitable theory, without even discussing its jurisdiction. *See e. g., Rash v. United States,* 360 F.2d 940, 944, 947, 175 Ct.Cl. 797, 804–05, 810–11 (1966) (mutual mistake in sale of land contract resulting in rescission; jurisdiction assumed); *National Presto Indus. Inc. v. United States,* 338 F.2d 99, 106–07, 110–11, 167 Ct.Cl. 749, 760–61, 767–69 (1964), *cert. denied,* 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed. 153 (1965) (mutual mistake of fact; jurisdiction assumed); *McNamara Constr. of Manitoba, Ltd. v. United States,* 509 F.2d 1166, 1167–68, 206 Ct.Cl. 1, 4–5 (1975) (reformation of contract under theory of mutual mistake denied; jurisdiction assumed). This continued assumption that we can properly use equitable theories in passing upon suits for monetary awards is grounded firmly on the Tucker Act's history, on unquestioned Supreme Court cases and on

---

**9.** The Note, which can be relied upon in interpreting a statute, *Western Pacific R.R. Corp. v. Western Pacific R.R. Co.,* 345 U.S. 247, 254–55 & n. 11, 73 S.Ct. 656, 97 L.Ed. 986 (1953), states that the quoted words: " * * * were omitted as unnecessary since the Court of Claims manifestly, under this section will determine whether a petition against the United States states a cause of action." The note continued by stating that at any rate the Court of Claims no longer has admiralty jurisdiction (which is not at issue here). *See* Reviser's Note after 28 U.S.C. § 1491 (1976).

Court of Claims decisions; we reaffirm both the practice and the principle.[10]

## III

### The merits

The two most significant dates in this case are the Union Oil well blow-out-and-spill on January 28, 1969, and plaintiffs' speedy institution of this action some two months later on April 9, 1969. The blow-out-and-spill created an immediate, major environmental emergency with serious political overtones; it evoked continuous and serious consideration by the Government, under great pressure, of the best course to pursue. Steps were first taken which proved tentative and later modified, but plaintiffs were not content to wait until the Government had had a fuller opportunity to plot its position. We analyze plaintiffs' theories of recovery in the strong light of the undeniable fact that in these circumstances the Pauley group allowed the Government only a short time in which to make its decisions before their petition to this court cried frustration, mistake, breach and taking.

A. *Frustration :* Plaintiffs' first and most strongly presented claim is that the promulgation on February 21, 1969 of a new regulation governing lessee liability for oil spills (30 C.F.R. § 250.42(b), *supra,* Part I, B) imposed for the first time strict liability to the government and to third parties, and that this new standard, in conjunction

with the independent collapse of the insurance market for oil spill damages,[11] profoundly frustrated the dominant purpose of their leases, after less than a year of their basic five-year terms. Accordingly, plaintiffs say, they are entitled on this ground to the return of the bonuses and rentals they paid to the Government (over $74,000,000).

We do not take up point-by-point the individual substantive arguments pressed by the parties.[12] To us, the decisive factors are that (a) both before and after the amendment of February 21, 1969, the standard of liability was uncertain and ambiguous, as was the application of the February 21st modification to existing leases like plaintiffs'; (b) the February change was under continuous review by Interior and was in fact modified later in 1969; (c) other oil companies continued to operate in the Santa Barbara Channel in 1969 despite the February amendment and the insurance collapse; and (d) in the face of all these circumstances plaintiffs did not seek authoritative clarification or wait or push for the uncertainty to be cleared up, but rushed *in medias res* to this court with their full-fledged frustration claim. These elements (which we shall spell out in turn) add up to a failure of proof by plaintiffs that by the time the suit began (or thereafter) an unexpected contingency had occurred which rendered performance of their leases commercially impracticable.[13]

---

10. *See also* the discussion of this point in Judge Nichols' concurring opinion in *Mitchell v. United States,* Nos. 772–71, 773–71, 774–71, and 775–71, decided this day.

11. As noted in Part I, B, n. 3, *supra,* there is no contention that the Government's modification of the liability regulation in February 1969 caused the disappearance of insurance for oil spills. Nor do plaintiffs claim frustration on the basis of the insurance collapse alone.

12. For instance, defendant claims that state law, not federal regulations, governed the standard of liability for damages to third parties, and that the state law of California already imposed a strict standard of liability on oil drilling as an ultrahazardous activity. Plaintiffs respond that federal law established the standard of liability because federal regulations

preempted state law standards, and that, even if state law controlled, under California law only oil drilling in inhabited areas is necessarily ultrahazardous.

13. Helpful guidelines for a frustration or impossibility claim are set forth in *Transatlantic Financing Corp. v. United States,* 124 U.S.App. D.C. 133, 363 F.2d 312 (1966): (1) did an unexpected contingency occur; (2) was the risk of the contingency allocated between the parties, either expressly or by custom; (3) did the occurrence of the contingency render performance commercially impracticable? 363 F.2d at 315. *See also, Natus Corp. v. United States,* 371 F.2d 450, 178 Ct.Cl. 1 (1967). We concentrate in this case on the first and the third of these guidelines.

(a). The standard of lessee liability for offshore oil spills, prior to the February 1969 amendment, was plainly unsettled. California law might apply [14] and, if so, it was unclear what that law was (as shown by the differing interpretations by the parties, *see* n. 12, *supra,* of the one decision on the matter by the Supreme Court of California, *Green v. General Petroleum Co.,* 250 Cal. 328, 270 P. 952 (1928)). To the uncertain extent federal law controlled, that was supplied by the Secretary's regulations under the Outer Continental Shelf Lands Act, and their coverage was likewise ambiguous. 30 C.F.R. § 250.30 (1969) stated that the lessee shall: " * * * take all reasonable precautions to prevent damage or waste of any natural resource or injury to life or property or the aquatic life of the seas." Section 250.40 further explicated the lessee's duty to control oil wells, subsection (a) requiring the lessee to take "all reasonable precautions" to control wells and subsection (b) mandating that the lessee adopt "all reasonable precautions" to prevent any well blowouts, and to exercise "due diligence" in controlling any blowout. The only specific mention of the lessee's duty to control pollution was contained in section 250.42, which said that the lessee: " * * * shall not pollute the waters of the high seas or damage the aquatic life of the sea or allow extraneous matter to enter and damage any mineral- or water-bearing formation." 30 C.F.R. § 250.42 (1969). None of the regulations or orders spoke directly to the standard of liability for damage to third parties through pollution or oil spills.[15]

Plaintiffs insist that these provisions imposed no more than liability for negligence, and that the February amendment established absolute liability toward the Government and third parties,[16] even though it did not use that term. In this broad interpretation of the amendment they are supported by a contemporaneous press conference statement by Secretary Hickel, but it is far from plain what a court would have decided if plaintiffs had seen fit to seek a declaratory judgment as to the amendment's meaning or judicial review of the amendment. Certainly a substantial argument could have been made that the amendment, if it actually changed the standard of liability, should not and could not apply to existing leases like plaintiffs'.[17] Of course, we are

---

**14.** Section 4(a)(2) of the Outer Continental Shelf Act [43 U.S.C. § 1333(a)(2)] stated that the civil and criminal laws of each adjacent state as of the effective date of the Act [August 7, 1953], shall be controlling " * * * [t]o the extent that they are applicable and not inconsistent with this act or with other Federal laws and regulations of the Secretary [of the Interior] now in effect or hereafter adopted * * *"

From the inception of the Act, commentators have noted that the determination of which state laws are "applicable and not inconsistent" and thus incorporated as the law of the United States under section 4(a)(2), is an open and controversial question. *See* Christopher, *The Outer Continental Shelf Lands Act: Key to a New Frontier,* 6 Stan.L.Rev. 23, 42 (1953). Judge Skelly Wright, then a judge in the United States District Court for the Eastern District of Louisiana, commented that it was difficult to visualize a more uncertain area of the law than the choice of law for contract and tort problems in the outer continental shelf. Wright, "Jurisdiction in the Tidelands" in *Legal Problems in the Tidelands; A Symposium,* 32 Tulane L.Rev. 173, 184–86 (1958).

**15.** The leases required the exercise of "reasonable diligence" in drilling and producing wells and required the lessees to carry out all reasonable government orders at their own expense " * * * [P]rovided, That the lessee shall not be held responsible for delays or casualties occasioned by causes beyond the Lessee's control." It was and is unclear whether this latter provision applied to anything more than the carrying-out of federal orders, or whether it covered liability to third parties at all.

**16.** Liability to third parties, if absolute, would clearly be of much more concern to plaintiffs and to other Santa Barbara Channel operators. Plaintiffs refer to the "staggering potential liabilities" to third parties if absolute liability prevailed. In particular, they mention earthquakes causing oil spills. The San Andreas fault line runs fifty miles from the Channel area at one point, and there exists the possibility of a great earthquake in the region.

**17.** The February 1969 amendment to 30 C.F.R. § 250.42 (which added subsection (b)) stated only that the lessee was obliged to pay costs of cleanup and "reparation of any damage to whomsoever occurring." Whether this regulation would have been read by courts as preempting state tort law and imposing a new federal standard of strict liability on current

not saying definitely that the amendment altered nothing for plaintiffs; all we suggest is that during February-April 1969, as before, there was sufficient doubt of the applicable standard of liability so to call for further exploration and further steps by plaintiffs before they could properly claim total frustration via an unexpected alteration in legal requirements.

(b). Also, in the spring of 1969 there was much concern in the oil industry over this February standard-of-liability amendment and it appears to have been under continuous review within the Interior Department. Early in May (after this suit had been brought) the Department announced a set of proposed amendments to 30 C.F.R. part 250, including the disputed section 250.42. 34 *Fed.Reg.* 7381, 7383 (1969). On August 22, 1969, after considering various comments submitted pursuant to this notice and a subsequent June notice, the Department promulgated amendments to 30 C.F.R. part 250. Concerning section 250.42, the preface stated that from the comments on 250.42(b) (*i. e.* the February amendment):

> * * * it appears that there is confusion and doubt regarding the original intent and purpose of the February 21, 1969, amendment to set forth in greater detail the existing responsibilities of an oil and gas lessee on the Outer Continental Shelf for the control and removal of pollutant, and that the amendment has been misunderstood. Accordingly, to eliminate any doubt or confusion as to the original intent and meaning of the February 21, 1969, interpretive amendment to §§ 250.42 and 250.43(b) is further amended for the purpose of clarification, and a new paragraph (c) is added.

34 *Fed.Reg.* 13,544 (1969).

Section 250.42(b) [redesignated 250.43(b)] was amended with slight wording changes, and a new subsection (c) was added:

> (c) The lessee's liability to third parties, other than for cleaning up the pollutant in accordance with paragraph (b) of this section, shall be governed by applicable law.

34 Fed.Reg. 13,547 (1969).

There has been no authoritative interpretation of this regulation, and we do not feel obliged to attempt one. It suffices for our purposes that if plaintiffs had waited for this change they might well have doubted that it established for them the new standard of absolute liability which they say they feared so much. At the least, they might well have sought an authoritative construction (*e. g.* through a declaratory suit) before taking the definitive step of announcing and acting as if the leases had been wholly frustrated by imposition of a new requirement that they assume absolute liability.

(c). Despite the February 1969 amendment and the collapse of the insurance market, other oil companies drilled and operated in the Santa Barbara Channel in the spring and summer and fall of 1969. *See* Part I, B, *supra*, Part III, C, 2, *infra*. Plaintiffs seek to minimize this fact by asserting that only the "major" oil companies could afford such risks, and the smaller companies like plaintiffs could not sustain the risk of drilling. This attempted distinction will not work, in part because the law requires an objective view of commercial frustration or impossibility—the fact that a risk makes the contract unreasonable for a particular party is no excuse. *See Restatement (Second) of Contracts*, § 281, comment e (Tent. draft No. 9, 1974); *Clark Grave Vault Co. v. United States*, 371 F.2d 459, 461 (1967); 178 Ct.Cl. 52, 54–55, 6 A. Cor-

---

leases is uncertain. Some legal commentators on the Santa Barbara oil spill assumed without discussion that state tort law governed liability to third parties for oil spill damages. *See* Note, *Pollution of the Marine Environment from Outer Continental Shelf Oil Operations*, 22 So.Car. L.Rev. 228, 237–39 (1970). Indeed, in one of Pauley's own contemporaneous memoranda there is language suggesting uncertainty as to

the application of the February amendment. *See* n. 5, in Part I, B, *supra*. Other oil companies apparently claimed that the new oil spill regulation did not apply to them since it was not existing at the time the leases were issued. *See* Nanda & Stiles, *Offshore Oil Spills: An Evaluation of Recent United States Responses*, 7 San Diego L.Rev. 519, 529 (1970).

bin, On Contracts § 1332. Further, while plaintiffs assert that only "major" companies with greater capital resources and technology were able to continue drilling, they make no attempt to show that the liabilities were so great and so threatening that any oil company other than one of the "seven sisters" could not afford to drill in the Santa Barbara Channel. Indeed, some of the plaintiffs, in their own annual reports published after promulgation of the "new" liability standard, indicated plans to continue drilling as soon as the temporary government "suspension" was lifted. At the time of these reports there was no indication that further drilling was impossible due to excessive liability. The 1968 annual reports of Husky, Colorado's parent company, and Kewannee, all published in March 1969, indicate plans to continue drilling if the government lifted its "suspension." This suggests that at least some of the plaintiffs did not find the Government's "new" liability regulation so immediately prohibitive as to foreclose any possibility of drilling.

(d). In view of what we have recited thus far, little need be added to underline plaintiffs' undue haste in running to this court on April 9, 1969, with a claim of gross frustration through the February 21, 1969 amendment to the regulations. In February–April 1969 the situation was surely unclear, unsettled, and in flux. Neither the prior liability standard nor the February one was at all definite. But, as we have said, plaintiffs did not seek any authoritative clarification nor did they wait for the solution or the clarification which time could have brought. The result was that, when the petition was filed, there was and could be no proper showing that an unexpected change in the standard of liability had actually occurred for plaintiffs, or that their further performance had thereby been rendered commercially impracticable. Nor have events since April 9, 1969 shown the existence of these elements of their frustration claim. We do not say that plaintiffs necessarily had to wait for a complete and final resolution of the whole liability problem, but only that they could not correctly claim frustration while it was legally so obscure that their standard of liability had increased at all [18]—and that, if it had, they were in commercial fact precluded from drilling and operating.

B. *Mistake* : Plaintiffs also present an alternative claim of mutual mistake which they say warrants rescission of the contracts and return of their bonus and rent payments. This contention is that, even if a strict standard of liability for oil spill damages existed at all relevant times in California and governed plaintiffs' operations, then both sides were mistaken at the time of the leases—both assuming (according to the claim) that a negligence standard controlled oil drilling liability in the Santa Barbara Channel.

■ The simplest answer to this point is that plaintiffs have failed to prove either that the absolute liability standard controlled (either under California law or under the federal regulations) when the leases were made in 1968, or that at that moment the Government thought that negligence was the proper standard. Our discussion, Part III, A, *supra,* on the frustration claim shows how indefinite and uncertain the entire subject was and continued to be. A

---

**18.** In the presence of all this doubt, this court, in which the frustration claim is pressed, cannot be expected to decide for itself, *post hoc* in 1979, that the standard of liability was in fact drastically raised in February 1969 and therefore that plaintiffs' frustration claim should now be sustained, looking backward to 1969. Decisions upholding claims of frustration through changes in the law have rested on an overwhelming showing that the alleged legal impediment actually existed at the pertinent time. *See Walker v. Continental Life & Accident Co.,* 445 F.2d 1072 (9th Cir. 1971); *West*

*Los Angeles Institute for Cancer Research v. Mayer,* 366 F.2d 220 (9th Cir. 1966), *cert. denied,* 385 U.S. 1010, 87 S.Ct. 718, 17 L.Ed.2d 548 (1967). No such demonstration has been made here. A court asked, long after the event, to find frustration through an alleged change in the law should not be called upon to pick its own troubled way along very uncertain ground. The claim of frustration presupposes that the disabling change in the law was clear and definite at the time the suing party threw up its hands.

claim of mutual mistake cannot find any footing in such spongy ground. On the contrary, relief for mistake should rest on a showing which is "clear and convincing." 13 S. Williston On Contracts, (Third ed. 1957) § 1580.

In addition, the demand for rescission on the basis of mutual mistake sinks because plaintiffs have failed to prove any mistake as to a basic, fundamental, or central assumption of the contract. *See* 13 S. Williston On Contracts, (Third ed. 1957) § 1584. "The court must be satisfied, that but for the mistake the complainant would not have assumed the obligation for which he seeks to be relieved." *Grymes v. Sanders,* 93 U.S. 55, 60, 23 L.Ed. 798 (1876). The standard of liability—especially as to third parties—has not been shown to us to be such a subject. The lease terms appear not to cover it, nor did the then regulations and Interior Department orders;[19] there was no consideration or discussion given by the parties to that issue when the leases were negotiated; and there is no demonstration that either party, let alone both, thought the issue central to the contracts. *See Grymes v. Sanders,* 93 U.S. 55, 60–61, 23 L.Ed. 798 (1876); *Tombigbee Constructors v. United States,* 420 F.2d 1037, 1040–41, 190 Ct.Cl. 615, 622–23, 627 (1970); *Hannah v. Steinman,* 159 Cal. 142, 149, 112 P. 1094, 1097 (1911). *Compare National Presto Industries, Inc. v. United States,* 338 F.2d 99, 108, 167 Ct.Cl. 749, 763 (1964), *cert. denied,* 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965) (parties explicitly negotiated new

manufacturing process which was of critical interest to government, mutual mistake found) with *Tombigbee Constructors v. United States,* 420 F.2d 1037, 1041, 190 Ct.Cl. 615, 623–24 (1970) (no discussion of possible flooding of proposed barrow for backfill; no mutual mistake).

A related reason for rejecting plaintiffs' mutual mistake claim is the lack of any evidence (or even argument) that the availability of oil spill insurance was a basic assumption of the contract. Under plaintiffs' hypothesis it was the conjunction of a strict liability standard and the absence of procurable insurance that together made the risks of drilling unacceptably high. It is only a mistake about the applicable liability standard, joined together with a mistake about the availability of insurance, that would suffice to show that the parties were mistaken about a basic assumption of the contract—the level of risks in drilling. But plaintiffs have not shown or argued that either party made the continued availability of insurance a basic assumption of the contract.[20]

C. *Breach*: Plaintiffs' claim for total breach of contract has three prongs: (1) the Interior Department's failure to act on plaintiffs' application of February 11, 1969, for permission to drill a second well on tract 384; (2) Secretary Hickel's clearance procedures, which plaintiffs characterize as a "sham" and camouflage for an indefinite suspension of operations, and (3) the February 19, 1969 amendment to the regulations (already discussed) which plaintiffs say im-

**19.** Plaintiffs' attempt to avoid this conclusion by arguing that language implying a negligence standard—"reasonable diligence," "reasonable precautions"—appeared in the orders and the lease. However, none of the regulations, orders or lease terms to which plaintiffs advert appeared to deal with liability to third parties, and even for the government the adoption of a negligence standard (if state law called for absolute liability) was unclear. The references to "reasonable diligence" and "reasonable precautions" might not necessarily imply a negligence standard if state law was contrary.

**20.** Plaintiffs also raise a secondary argument: even if the government was not mistaken, plaintiffs are entitled to rescission because the government made representations that the

standard of liability was negligence. This argument lacks any merit. The facts do not indicate that the government made any representation, explicit or implicit, as to third party tort liability. Further, plaintiffs' allegation of a government "misrepresentation" is far removed from the types of misrepresentations which induced a private party's reliance and therefore produced a ruling of rescission in previous cases. *See Staten Island Hygenia Ice & Cold Storage Co. v. United States,* 85 F.2d 68, 71 (2d Cir. 1936); *Timber Investors, Inc. v. United States,* No. 61–75, slip op. at 5 & n. 2, 587 F.2d 472 (Ct.Cl. Nov. 15, 1978); *Tree Preservation Co. v. United States,* 172 Ct.Cl. 577, 581 (1965).

posed for the first time a strict liability standard.

■■■ 1. Reliance on the first two matters is practically foreclosed by the trial judge's factual conclusion (which we accept) that

> * * * plaintiffs have not intended since mid-March 1969, after considering the new liability regulation issued by Secretary Hickel, to conduct further drilling operations on subject tracts, and that this is the reason why they failed to pursue the Department of the Interior's clearance procedures to permit future drilling operations, and why they failed to file an application for a permit to do further drilling in compliance with the requirements of OCS order No. 10.
>
> Finding 78(k).

This finding is well supported by the prior findings and by the record (*see* Part I, A, B, *supra*; Part III, C, 2, *infra*)—and we do not and should not overturn it. *See Davis v. United States,* 164 Ct.Cl. 612, 616–617 (1964). Under this conclusion, plaintiffs cannot well contend that they were hurt either by the failure to act on their drilling application or by the clearance procedures.

■■■ 2. In any event, we are satisfied that Interior's conduct with respect to plaintiff's operations was both authorized and reasonable during the period from the Union Oil blowout on January 28, 1969 to the institution of this suit on April 9, 1969— and that thereafter Interior could properly assume that plaintiffs desired to litigate, rather than to drill or operate.

We must start, on this facet of plaintiffs' petition, as on the others, from the undeniable premise that the blowout on January 28th created an important emergency in the area of the Santa Barbara Channel. The oil spill covered some fifty square miles, causing extensive damage to the heavily populated coasts and to the marine ecosystem. This ecological disaster evoked great popular concern in the region, and the Federal Government obviously had to review its position and consider what to do.

The Secretary had broad power, under the Outer Continental Shelf Lands Act, to prescribe necessary rules and regulations, including "such rules and regulations as he determines to be necessary and proper in order to provide for the prevention of waste and conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein, and, notwithstanding any other provisions herein, such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter." 43 U.S.C. § 1334(a)(1) (1970).[21] Both this court and the Ninth Circuit have already considered the Secretary's powers under the Act and have concluded that it grants him considerable, though not plenary, authority to suspend drilling operations or regulate leases in the interests of conservation. *See Sun Oil Co. v. United States,* 572 F.2d 786, 802, 215 Ct.Cl. 716, 741 (1978) *[Sun Oil]; Union Oil Co. of Cal. v. Morton,* 512 F.2d 743, 747–48 (9th Cir. 1975) *[Union Oil]; Gulf Oil Corp. v. Morton,* 493 F.2d 141, 144 (9th Cir. 1973) *[Gulf Oil].*[22]

It is within this statutory framework that we must evaluate plaintiffs' claim of breach because Interior failed to act, before this suit was brought, on their application (filed February 11, 1969) to drill a well on tract 384. Under the contractual provisions and practices, as well as under the Administrative Procedure Act and established law, the

---

**21.** The wording "conservation of natural resources * * *" has been correctly construed to give the Secretary power to consider all natural resources of the outer continental shelf, not just mineral resources. *Gulf Oil Corp. v. Morton,* 493 F.2d 141, 144–45 (9th Cir. (1973); *Union Oil Co. of Cal. v. Morton,* 512 F.2d 743, 749–50 (9th Cir. 1975).

**22.** The then regulations provided for the suspension of operations " * * * in the interests of conservation" 43 C.F.R. § 3383.5(a) (1969) or where the operations endanger life or threaten immediate and serious damage to "the leased deposits or other valuable mineral deposits" 30 C.F.R. § 250.12(b) (1969). This latter provision was amended, in August 1969, specifically to include "aquatic life," "the environment," and "property."

Department certainly had a reasonable time in which to respond. *See Sun Oil*, 572 F.2d 786, 215 Ct.Cl. 716 (1978).[23]

On the record before us, we have to conclude that the delay here, in view of the crisis produced by the oil spill, was reasonable.[24] After the spill, there was a need to gather and evaluate additional data on the environmental risks of drilling in the Santa Barbara Channel. Secretary Hickel's temporary suspension of drilling and task force review of each lease was justified by the then-existing circumstances and fully supported by the subsequent enactment of the National Environmental Policy Act of 1969 (effective January 1, 1970). 42 U.S.C. §§ 4321–4332 (1976); *see Union Oil*, 512 F.2d 743, 749–50 (9th Cir. 1975). Such an environmental review takes time, as we noted in *Sun Oil*, 572 F.2d 786, 804–05 & nn. 25–27, 215 Ct.Cl. 716, 746–47 (1978). As in *Sun Oil*, we find no support for the view that Interior's delay in this case was overly long. Pauley's February 11th application was received in the local Interior office on February 17, 1969, and held in abeyance

pending the Department's environmental review. By March 1, 1969, Secretary Hickel sent a telegram to all lessees requesting additional geological data, and on March 25th OCS Order No. 10 (*see* Part I, B, supra) was promulgated, establishing new standards for drilling applications.[25] By April 1, 1969, the Secretary cleared some of the leases he had suspended from operations in February.

In sharp contrast to the steady progression of the Interior Department's review is plaintiff's own conduct. Pauley did not respond to the Secretary's March 1st telegram requesting information until early April, just before suit, and even then gave only a partial reply (*see* Part I, B, *supra*); and in Pauley's correspondence in March with the Interior regional office the lessees made no mention of or inquiry about the February drilling application. Further, they made no attempt to inquire about the possible application to their permit request of the newly-promulgated OCS Order No. 10. *See* note 25, *supra*. Then, on April 9th, this suit was abruptly begun, and Interior could rightly

---

**23.** The APA sections cited by plaintiffs, section 9(b), 5 U.S.C. § 558(c) (1976) and section 6(d), 5 U.S.C. § 555(e) (1976), if applicable, both provide the Government with a reasonable time. Section 558(c), which applies to any "license required by law," states that the agency " * * * *within a reasonable time*, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title or other procedures required by law and shall make its decision." (emphasis added). Similarly, section 555(e) requires "prompt notice" of any denial of a request in "any agency proceeding." This provision, even if otherwise applicable, governs only denials of applications, and Interior did not deny plaintiffs' application. Although an indefinite refusal to act might at some point constitute a "denial", that point was not reached here. Also, the standard of "prompt notice" in itself allows the Government a reasonable time to respond. *Cf. King v. United States*, 492 F.2d 1337, 1345 n. 27 (7th Cir. 1974) (indicating that district court on remand should allow agency flexibility in meeting requirements of section 555(e) to prevent delay of parole board decisions).

The cases plaintiffs cite as establishing a contractual obligation for a timely and good faith response, *George A. Fuller Co. v. United States*, 69 F.Supp. 409, 108 Ct.Cl. 70 (1947), and *Wah Chang Corp. v. United States*, 282 F.2d 728, 151 Ct.Cl. 41 (1960), also assume a "reasonable

time" standard. The court in *Fuller* expressly distinguished its facts (Government failure to timely furnish promised materials) with "*reasonable delays* due to making changes * *\**" 69 F.Supp. at 414, 108 Ct.Cl. at 100 (emphasis added). In *Wah Chang*, the court found an even broader exception to the "quick response" standard urged here by plaintiffs—sovereign actions taken by the United States for the greater public good. 282 F.2d at 734, 151 Ct.Cl. at 50–51. Also *see Tri-Cor, Inc. v. United States*, 458 F.2d 112, 131, 198 Ct.Cl. 187, 220–21 (1972) (what is "reasonable delay" depends on circumstances of particular case) *cited in Sun Oil Co.*, 572 F.2d 786, 804, 215 Ct.Cl. 716 (1978); *id.* at 745, 572 F.2d at 805 n. 26.

**24.** To repeat what this court has earlier observed concerning a similar delay: "The point, which plaintiffs [Sun Oil, et al.] seem to lose sight of, is that the blow out gave rise to a 'whole new ball game.' " *Sun Oil*, 572 F.2d 786, 804 n. 24, 215 Ct.Cl. at 716, 746 (1978).

**25.** OCS Order No. 10 terminated a prior order setting standards for drilling permits, OCS Order No. 2. Although Order No. 10 was not made expressly retroactive, plaintiffs made no attempt to inquire into the order's application to Pauley's February 11th application. *See* Part I, B, *supra*.

assume (particularly since plaintiffs did not indicate otherwise) that the February 11th drilling application was no longer being pressed.

█ Plaintiffs also see a breach in the special clearance procedure initiated by the Secretary in February 1969. These procedures, as we have said, involved the collection of additional physical data by a federal task force, a review of the particular lease with recommendations to be forwarded to Washington, where the Secretary himself would decide whether to clear the lease. Once cleared, the lessees could then apply for further drilling permits from the regional office, which could grant permits under the standard procedures. *See* Part I, B, *supra; cf. Sun Oil*, 572 F.2d 786, 802–03 & n. 19, 215 Ct.Cl. 716, 742–43 (1978). Plaintiffs describe these procedures as a "sham" and a facade to cover "arbitrary and *ad hoc*" bureaucratic actions, concealing Interior's shutdown of all future drilling. This description of Interior's procedures is a gross mischaracterization, lacking the clearly convincing evidence required to refute the presumption of government regularity and good faith. *See United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926); *Librach v. United States*, 147 Ct.Cl. 605, 612 (1959); *Sun Oil*, 572 F.2d 786, 805, 215 Ct.Cl. 716, 747 (1978). Not only do plaintiffs fail to present clear and convincing evidence of government deceit but the evidence points to a diligent, albeit slow, government review. By April 1, 1969, within two months of Secretary Hickel's February 7th telegram suspending the five operating leases, clearance was granted on four of the five leases. Clearance for the fifth suspended lease, delayed by the lessee's slowness in supplying additional information, was subsequently granted. *See Sun Oil*, 572 F.2d 786, 802–05, 215 Ct.Cl. 716, 741–44 (1968) (description of same—or very similar—review process for Sun Oil Company).

Plaintiffs then say that, even if clearance was granted, this was meaningless because no one was actually allowed to drill. As a factual matter this is incorrect. *Sun Oil* found that Sun Oil's platform drilling was resumed on its leases on July 21, 1970; that Union Oil was allowed to drill to drain certain reservoirs in June and July of 1969; and that Phillips Petroleum was allowed to resume drilling permanently on its lease in April 1969. 572 F.2d 786, 797–98, 800, 805 n. 27, 215 Ct.Cl. 716, 732–33, 738, 747.[26] Later on, there were suspensions for other reasons but subsequent actions by Interior as to other lessees with potentially different oil spill problems do not indicate that the whole program was a facade from the beginning. There are decisions involving subsequent drilling delays by the Department, finding that at least parts of those delays were valid. *See Gulf Oil*, 493 F.2d 141, 146–48; *id.* at 149 (petition for rehearing denied) (9th Cir. 1973); *Union Oil*, 512 F.2d 743, 746, 751–52 (9th Cir. 1975). In any case, whether other oil companies were later prevented from drilling after their clearance was granted is now irrelevant—the present plaintiffs did not even try for the preliminary clearance and have no grounds to complain of Interior's actions beyond the clearance stage.

Much is made of the Interior Department's supposed failure to tell the Pauley group, despite its inquiries, what was actually required for clearance. But we are satisfied (see Part I, B, *supra*, and Part III, C, *supra*) that plaintiffs made no real effort either to find out the requirements or to comply with those demands which it

---

26. Plaintiffs attempt to distinguish these drilling resumptions by stating that until 1974 no drilling was allowed in the "politically sensitive mid-Channel area" seaward of Santa Barbara, and all drilling which was allowed was in areas located in the "extremities" of the Channel. However, the Union Oil drilling took place on the Dos Cuadras field, the very field that was the site of the January 1969 blowout that polluted Santa Barbara beaches. Not only is the Dos Cuadras field physically closer to Santa Barbara, but a more "politically sensitive" area is hard to conceive. *See Sun Oil*, 572 F.2d 786, 798, 215 Ct.Cl. 716, 734 (1978). In any event, plaintiffs cannot escape the ultimate fact that at least some companies which obtained clearance were able to resume operations. If plaintiffs had gone through the required procedures for clearance and still not been allowed to drill, we might have a different case.

knew to exist. None of the minor items of federal omission cited by plaintiffs—all before the start of this litigation on April 9th—show that the Pauley group was unable to obtain the necessary information if it had really wanted to.[27] Even if we put to one side our conclusory finding that after mid-March 1969 plaintiffs no longer wished to drill (see Part III, C, 1, supra), the underlying findings leave the greatest doubt that plaintiffs were interested in March-April 1969 in pursuing any further drilling or oil operations.

3. A separate aspect of the breach claim is the February 21, 1969 change in the regulations which is said to have suddenly imposed the absolute liability standard for the first time. Reasoning similar to that which supports our denial of the frustration claim (Part III, A, supra) impels us to reject this breach claim as well. In the short period between February 21st and April 9th (when this suit began), the situation was so fluid and so unclear, the wording and application of the amendment so uncertain, that plaintiffs could not properly deem their contracts totally breached by the mere promulgation of the new regulation. At the time they began this action so hastily, plaintiffs could not properly say or show that the mere publication of the new regulation actually changed their liability or even if it might have that that change was more than purely theoretical or merely temporary, without real impact on their operations or their contracts—in short, the change, if any, in the standard of liability was not so definite, nor did it have so direct an impact, as to be an anticipatory breach of the leases. And events since the litigation began have not improved plaintiffs' position on that score.

Even if the Government had expressly and clearly imposed, in February 1969, a new standard of absolute liability and that new standard had been plainly applicable to pre-existing lessees like plaintiffs, we would not think that the lease-contracts had been violated. The contention of breach invokes a lease provision that the lease was subject to the Outer Continental Shelf Act and " * * * to all *lawful and reasonable regulations* of the Secretary of the Interior * * * *when not inconsistent with any express and specific provision herein, which are made a part hereof* " (emphasis added). But plaintiffs' 1968 leases (even as read to incorporate the then-existing regulations) did not expressly or specifically cover the problem of liability for oil spills—especially not the standard of responsibility for damage to third parties. See Part III, A and B, supra. Accordingly, a new regulation explicitly establishing absolute liability would not be "inconsistent with any express and specific provision" of the leases.[28]

We also have to take it, on the present record, that such an express regulation would be "lawful and reasonable." As we have pointed out, the Continental Shelf Act provides:

> The Secretary may at any time prescribe and amend such rules and regulations * * * in order to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf * * * and, notwithstanding any other provisions herein, such rules and regulations shall apply to all operations conducted under a lease issued or maintained under the provisions of this subchapter. 43 U.S.C. § 1334(a)(1) (1970).

The Ninth Circuit, faced with precisely the same lease provision in *Union Oil*, held that it did not preclude the Secretary from issu-

---

**27.** It is unclear whether the clearance procedures should have been published under the Administrative Procedure Act or the Freedom of Information Act, as amended, 5 U.S.C. § 552(a)(1) (1976). However that may be, plaintiffs cannot claim a total breach-of-contract because of such a failure; they could have obtained the information if they had wished to press their February drilling application.

**28.** If we are wrong and such a new regulation would be inconsistent with the lease or with the prior law, then the new regulation would be unenforceable against plaintiffs and the latter could defend against claims based on the new regulation. We do not consider that mere promulgation of such an unenforceable and invalid regulation would be enough for the lessees to declare a total breach of the leases.

ing new regulations and applying them to current leaseholders, but that the Secretary could not cancel a lease based on a violation of a new regulation. 512 F.2d at 748–49. In *Sun Oil* this court analyzed the same lease provision and concluded that the Secretary would be liable under the lease only if his actions constituted an " * * * unbridled, unjustified and unreasonable interference" with lease rights. 572 F.2d at 802, 215 Ct.Cl. at 741. Plaintiffs have not shown that in the circumstances here—assuming, as we now do, that neither the leases nor the original regulations covered the topic of the standard of liability—the creation of absolute liability for pre-existing leases would be an unjustified or unreasonable interference by the Government with those contracts. The widespread dangers of massive oil spills had been emphasized by a series of accidents, the latest of which was the Union Oil blowout. Plaintiffs do not tell us that the conservation and waste provisions of the Act would fail to support such a regulation in this situation, and we can presume that there would be adequate statutory authorization. The truth is that the major problems an existing lessee might encounter from such an express creation of a new standard of absolute liability would flow, not from the new regulation itself, but from the absence of insurance—a problem for which in this case the Government was in no way responsible.

■ D. *Taking:* Plaintiffs likewise maintain that the Secretary's new regulations and clearance program (which they perceive as totally suspending all rights to use their leases) constituted a fifth amendment taking of the leases. It suffices in answer that, even if we accepted plaintiffs' characterization of the facts (which, as discussed above, we do not), there could be no such taking. Plaintiffs fail to meet at least one of the prerequisites for a constitutional taking—the requirement that the taking be authorized by Congress. In order to establish a constitutional taking, plaintiffs must

show that the officer committing the alleged taking has either express or implied legislative authority to take the property. *See, Hooe v. United States*, 218 U.S. 322, 335–36, 31 S.Ct. 85, 54 L.Ed. 1055 (1910); *United States v. North American Transp. & Trading Co.*, 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935 (1920); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 127 n. 16, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); *Coast Indian Community v. United States*, 550 F.2d 639, 649, 213 Ct.Cl. 129, 147–48 (1977); *Sun Oil*, 572 F.2d. 786, 819, 215 Ct.Cl. 716, 772 (1978). *See generally*, 2 Nichols' The Law of Eminent Domain, § 6.1 at 3–4 (rev. 3d ed. 1976).

■ Here, the Outer Continental Shelf Lands Act contains no authority for the Secretary to take property by completely and indefinitely halting all drilling (as plaintiffs' claim that Secretary Hickel did). Section 12(c) provides the only express power for the Secretary of the Interior to suspend all operations, but this applied only during a war or national emergency upon a recommendation by the Secretary of Defense. 43 U.S.C. § 1341(c) (1970); *see Sun Oil*, 572 F.2d 786, 819, 215 Ct.Cl. 716, 772 (1978).[29] Sections 5(b) and 8(i) allow the Secretary to cancel leases, but only for violations of regulations in force at the time of the lease issuance or upon proof of fraud in the transaction. 43 U.S.C. § 1334(b) (1970); *id.* at § 1337(i); *see Union Oil*, 512 F.2d 743, 747–48 (9th Cir. 1975). Nor is there any implication of a congressional authorization to the Secretary to suspend all drilling indefinitely. The Ninth Circuit in *Union Oil* concluded:

> Although 30 C.F.R. § 250.12 provides expressly that a "suspension" shall be limited in time only by the Secretary's judgment that the environmental threat has ended, and although 43 U.S.C. § 1334(a)(1) authorizes regulations providing not only for suspensions but for any other action affecting operations

---

**29.** Although the 1978 amendments to the OCS Lands Act (not applicable here) do provide a new, broader authorization for cancellation of leases, the Secretary's power is carefully circumscribed. *See* Outer Continental Shelf Lands Act Amendments of 1978, Pub.L.No.95–372, § 204, 92 Stat. 629, 636–40 (to be codified in 43 U.S.C. § 1334).

which the Secretary determines "necessary and proper" and "conservation of natural resources," Congress clearly did not intend to grant leases so tenuous in nature that the Secretary could terminate them, in whole or in part at will. [footnote omitted]. 512 F.2d at 750.

The Court of Appeals concluded that the Secretary had no implied authority to condemn leaseholds or to prohibit their beneficial use: "But Congress no more impliedly authorized the Secretary to take the leasehold by prohibiting its beneficial use than by condemnation proceeding. A suspension for which the fifth amendment would require compensation is therefore unauthorized and beyond the Secretary's power." 512 F.2d at 751.[30] *Sun Oil* quoted parts of the *Union Oil* decision and agreed with the Ninth Circuit's holding. 572 F.2d 786, 819, 215 Ct.Cl. 716, 772 (1978). There is no reason to alter our conclusion. Plaintiffs cite some other statutes as a possible basis of the Secretary's authority, but these have no pertinence.[31] Nor is this a case in which there has been legislative ratification of theretofore unauthorized activity. It follows, even on the erroneous assumption that the Secretary suspended plaintiffs' operations indefinitely and entirely, that there was no constitutional exercise of the eminent domain power.

We have found that the Secretary did in fact suspend plaintiffs' drilling rights for a very short period, but we have also held (*see* Part III, C, *supra*) that such a temporary suspension was authorized by the Out-er Continental Shelf Lands Act and reasonable in the circumstances. *See Sun Oil*, 572 F.2d 786, 802, 215 Ct.Cl. 716, 741 (1978); *Union Oil*, 512 F.2d 743 (9th Cir. 1975); *Gulf Oil*, 493 F.2d 141, 144 (9th Cir. 1973). This short, temporary suspension was plainly not so severe a property deprivation as to constitute a fifth amendment taking. *See United States v. Central Eureka Mining Co.*, 357 U.S. 155, 168 (1958); *Johnson v. United States*, 479 F.2d 1383, 202 Ct.Cl. 405 (1973); *cf.* 43 C.F.R. § 3383.5(a) (1969) (providing for abatement of rents and royalties and extension of the lease term during a suspension ordered by the Secretary).[32]

E. *Partial breach claim:* On April 10, 1978, after this case was ready for oral argument, plaintiffs belatedly filed a motion to add a fifth count for recovery for a *partial* breach. The counts on which the case had been earlier tried and briefed were either for rescission, or taking, or a total breach.[33] The new partial breach claim was based on the supposition that, although the Government had completely suspended all drilling in 1969 for an indefinite period, by 1974 the Government had lifted its suspension in reaction to the decisions in *Gulf Oil* and *Union Oil*, and to the energy crisis. According to plaintiffs, this alleged suspension from 1969 to 1974 allows them to recover, if not for a total breach, then for a partial breach; compensation for such a partial breach, they say, would be delay damages (said to be some 39 million dollars), plus an extension of their leases for the over four-year length of the asserted

---

**30.** Although the court in *Union Oil* went on to discuss whether the Secretary's actions in that case constituted a "taking," this language was not inconsistent with the court's earlier analysis of the authority issue. *Cf. Sun Oil*, 572 F.2d 786, 819 n. 50, 215 Ct.Cl. 716, 771 (1978).

**31.** *E. g.*, 40 U.S.C. § 257 (1976) grants any officer of the government power to acquire land by condemnation "In every case in which the * * * [officer] has been, or hereafter shall be, *authorized* to procure real estate for the erection of a public building or for other public uses * * *" (emphasis added). Independent authority must be shown. 16 U.S.C. § 760f (1976) did provide the Secretary of the Interior (now transferred to the Secretary of Commerce) with authority to acquire lands, but only for the purpose of that subchapter—studying migratory marine fish.

**32.** Plaintiffs have not asked for a refund of the proportionate part of the rents for 1969 attributable to the period from February 11, 1969 (when they filed their drilling application) to April 9th (when they commenced the suit), and therefore we need not consider whether 43 C.F.R. § 3383.5(a) (1969) applies to this situation. Nor, for obvious reasons, have plaintiffs sought a comparably short extension of their basic five-year lease-terms which expired in 1973.

**33.** The claims for *total* breach we have considered and rejected above in Part III, C.

suspension. Defendant vigorously objects to the proposed amendment, and because of the motion's lateness the matter is within the court's discretion. We do not stop to weigh whether we should exercise that discretion in plaintiffs' favor because our discussion of the original claims of total breach shows that the new demand for partial breach is also without merit. The factual predicate of the new claim is that the Government suspended all drilling in the Santa Barbara Channel from 1969 until 1974, and we have already rejected that position insofar as plaintiffs are concerned. The motion to amend is therefore denied.

## IV

### Summary

Each of the legal theories advanced by plaintiffs is ultimately premised on a single basic perception of the circumstances—that the Secretary's new liability regulation, alone or together with the Department's inaction on the Pauley group's drilling application and the Departmental clearance program, effectively shutdown plaintiff's drilling and operations in the Santa Barbara Channel for an indefinite period. It is on that hypothesis that plaintiffs justify their filing of this suit so relatively soon after the Union Oil blowout late in January 1969. We have come to a different conclusion—that the liability regulation of February 1969, the delay in acting on plaintiffs' drilling application, and Interior's clearance program were all interim and temporary measures, not unreasonable in the situation at that time, which were taken in the immediate aftermath of a major environmental disaster in the Channel and did not absolutely or indefinitely foreclose future operations by plaintiffs. On this view, all of plaintiffs' claims—whether frustration, mutual mistake, total or partial breach, or taking—must fail.

True, plaintiffs paid some 73 million dollars plus annual rent for leases with a minimum five-year term and drilled only for eleven months, but this unhappy result was ultimately the product of their own rush to this court. Plaintiffs did not try to ascertain the effect on them of the new liability regulation nor did they wait to see if (as in fact actually happened within six months) the government might change the ambiguous regulation. They did not attempt to comply with the new clearance procedures in an attempt to have their leases cleared (as did other Channel lessees). They did not pursue their drilling application. Instead, in the midst of a transition period of great uncertainty, they quickly made the worst possible interpretations of the government's actions and came at once to this court with claims that the lease-contracts were wholly at an end and that they were entitled to receive back their entire investment, at the least, and possibly over 300 million dollars in lost future profits.

As a court of law, we cannot give plaintiffs any relief because they had no legal rights, vindicable here, when they brought suit, and have not acquired any in the course of the litigation. Perhaps the legislative or executive branches could, as a matter of grace or policy, extend their lease-terms to permit them to drill further (if they still wish to) in the effort to discover oil in commercial quantities, but of course we cannot take that step.[34]

For the reasons given in this opinion, we hold that plaintiffs are not entitled to recover and that their petition must be dismissed.

## CONCLUSION OF LAW

Upon the foregoing opinion and upon the findings, the court concludes as a matter of law that plaintiffs are not entitled to recover and that the petition is dismissed.

---

**34.** Congress has recently amended the Outer Continental Shelf Lands Act to deal with some of the problems which have surfaced in this litigation. Congress established a fund to pay for oil spill cleanup costs and damage liabilities to private third parties; the President was also directed to review whether private oil pollution insurance was reasonably available. Outer Continental Shelf Lands Act Amendments of 1978, Pub.L.No.95–372, §§ 301–305, 92 Stat. 629, 670–78 (1978).